STROUD, Judge.
 

 *601
 
 Defendant Glenn Anthony Hill ("Husband") appeals from the trial court's order modifying alimony and child support. Husband argues that the trial court erred by imputing income to him during his period of unemployment after an involuntary termination, based on bad faith, despite its findings he was diligently seeking a job with earnings similar to his prior jobs. Husband also argues that the trial court erred by holding
 
 *602
 
 him in contempt of court for failure to pay his support obligations during a portion of the four years prior to the hearing, since plaintiff Lisa Smith Hill's ("Wife")'s contempt motion did not give him notice of her claim on the entire time period, and because the trial court's order held him in contempt for violating orders which were not actually in force at the time of the contempt, given the trial court's simultaneous modification of the order effective back to the dates of filing of the motion to modify. In addition, he argues the trial court erred in its award of attorney fees of a lump sum, without differentiation between the amounts awarded for each of the three claims-modification of child support, alimony, and contempt-and without the required findings of fact required for every claim. For the reasons explained below, we affirm in part and reverse and remand in part the trial court's order on alimony and child support; conclude the trial court did not err in finding Husband in civil contempt for failure to pay based upon his arguments that the order was not still "in force" and that he did not have proper notice, but reverse and remand for any revisions needed to the purge conditions based upon arrearages owed; and reverse and remand the trial court's order on attorney fees.
 

 Background
 

 The parties were married in 1992 and have three children. They separated in October 2010 and were divorced in July 2012. On 15 March 2011, they entered into a consent order regarding child custody, child support, and post-separation support; Husband was required to pay child support of $3,500.00 per month and postseparation support of $4,500.00 per month and to maintain medical insurance on Wife and their children. When the consent order was entered, Wife was unemployed and Husband was working in China. The order did not make detailed findings regarding the parties' expenses or Husband's income, but Husband was employed with Company in China and earned $543,000.00 in 2011.
 

 The order which is the subject of this appeal addresses Husband's motions to modify the alimony and child support obligations set by the consent order entered in 2011
 
 [1]
 
 and other pending motions. On 15 January 2012, Husband was involuntarily terminated from Company. On 7 February 2012, Husband filed a motion to modify his child support obligation based upon his job loss. On 18 June 2012, he moved to
 
 *603
 
 modify his postseparation support obligation. On 30 July 2012, the trial court held a hearing on Husband's motion to modify child support and Wife's
 
 *215
 
 alimony claim. Both Husband and Wife were unemployed at the time of this hearing.
 

 On 31 August 2012, Wife began working with the New Hanover County Schools as a speech pathologist. On 12 September 2012, the trial court entered an order on alimony. Although Husband was unemployed, the trial court set permanent alimony at $4,500.00 per month-the same as when he was earning over $500,000.00 annually-based upon his estate of $627,618.00. The order found that both parties would have to deplete their estates since neither was employed. Also, on 12 September 2012, the trial court entered an order denying modification of child custody and child support, finding no substantial change in circumstances to justify modification. On 19 September 2012, Husband filed another motion to modify both permanent alimony and child support, based in part upon Wife's having gotten a job between the time of the hearing on modification of child support and setting alimony and entry of the orders based upon that hearing. On 25 September 2012, Husband filed a Rule 59 motion alleging that the trial court erred by failing to include any findings regarding his involuntary reduction in income.
 

 In May 2013, Husband filed a lawsuit in federal court against Company asserting claims arising out of his termination. On 31 July 2013, the trial court heard Husband's Rule 59 motion, and on 30 August 2013, the court entered an order that set aside the 12 September 2012 order denying modification of child support and ordered a new trial on child support. Husband's motion to modify child support filed on 7 February 2012 remained unresolved. On 6 December 2013, Company's motion to dismiss Husband's federal lawsuit was granted in part; subsequently, on 17 December 2013, Husband signed a settlement agreement with Company.
 

 Nearly three years later, on 5 April 2016, the trial court heard all of the pending motions: both of Husband's motions for modification of his support obligations (the motion for modification of child support filed on 7 February 2012 and motion to modify alimony and child support filed 19 September 2012); Wife's response to Husband's motion to modify permanent alimony and motion to modify child support, including a motion to deviate from the child support guidelines; and Wife's motion for contempt for failure to pay child support and alimony filed on 31 July 2013. The trial court entered its order addressing the motions on 12 May 2016, and Husband timely filed notice of appeal to this Court.
 

 *604
 

 Analysis
 

 As noted above, Husband raises three issues on appeal. We address each in turn.
 

 I. Modification of Alimony and Child Support
 

 Husband argues that the "trial court erred as a matter of law and abused its discretion in setting awards of alimony and child support based upon imputation of income and the trial court's deliberate depletion of defendant's estate." (Original in all caps). This argument has four sections: (a) inadequacy of the findings of fact to support imputation of income; (b) failure to consider Husband's actual income during several periods of time and retrospectively basing his obligations upon his current income; (c) improperly finding Husband's ability to pay his obligations based upon depletion of his estate; and (d) a mathematical error in the calculation of alimony arrearages.
 

 Most issues in this appeal are based upon the determination of Husband's income and ability to pay child support and alimony when he was unemployed. Because his initial motion to modify was filed in February 2012, and the motions were not heard until over four years later, on 5 April 2016, the trial court's order addressed the parties' incomes and expenses during several distinct time periods. From February 2012 until 31 August 2012, both parties were unemployed. From 31 August 2012 until 29 June 2015, Wife was employed and Husband was not. On 29 June 2015, Husband began his new job with Ebara in Nevada, with an income of $275,000.00 plus an annual performance incentive and various benefits. Based upon the date of the motions filed, the trial court considered the motion to modify child support from March 2012 to the date of hearing, and the motion to modify alimony from October 2012 to the date of hearing. Although we understand
 
 *216
 
 that our trial courts are overburdened and delays in hearings are sometimes inevitable, most of the issues and legal and mathematical complications in this case would have probably been avoided if Husband's motions to modify his support obligations had not been delayed for approximately four years after filing.
 

 A. Inadequacy of the findings of fact to support imputation of income
 

 The current dispute began after Husband was involuntarily terminated from his job in China on 15 January 2012. He was then unemployed and engaged in a job search until 29 June 2015. Since his only regular income was from his employment, he had no income during this time. The trial court found that Husband had no income from March
 
 *605
 
 2012 until December 2013. In 2014, Husband received $351,937.52 gross funds from the settlement of his lawsuit against Company, and in one analysis of Husband's income, the trial court averaged this amount over the months of 2014, finding Husband's income as $29,238.00 per month. From January to June 2015, the trial court found Husband again had no income. As of July 2015, when Husband began working for Ebara, until December 2015, the trial court used Husband's actual income, which averaged to $27,250.00 per month. The trial court also did an alternative analysis of Husband's income, averaging Husband's total income received from 1 March 2012 until 31 December 2014, or 34 months; the total W-2 income was $456,701.00, for an average monthly gross income of $13,432.00.
 

 Although Husband had no income during most of the four year period, the trial court's order did not reduce his child support obligation for that time period, but set child support at $3,500.00 per month from March 2012 to 1 June 2015 and increased it to $4,200.00 per month, plus 15% of any annual bonuses received as of 1 July 2015. Husband's alimony obligation was reduced from $4,500.00 per month to $3,500.00 per month, back to 1 October 2012, to be paid for ten years. The trial court also held Husband in willful contempt for his failure to pay child support and alimony from June 2013 through March 2016.
 

 Husband argues that the trial court erred by failing to set his support obligations based upon his actual income from March 2012 until July 2015, because the findings do not support imputation of income. Wife argues that the trial court made sufficient findings to support imputation of income to Husband, and in the alternative, that the trial court actually did not impute income to Husband but instead considered his "income from all available sources" or averaged his "income over four years" and determined that depletion of his estate to pay his obligations would be proper.
 

 Normally, both alimony and child support are set based upon the parties' actual incomes at the time of the order.
 
 See generally
 

 Frey v. Best
 
 ,
 
 189 N.C. App. 622
 
 , 627, 631,
 
 659 S.E.2d 60
 
 , 66, 68 (2008).
 

 Regarding alimony, this Court has explained that
 

 Alimony is ordinarily determined by a party's actual income, from all sources, at the time of the order. To base an alimony obligation on earning capacity rather than actual income, the trial court must first find that the party has depressed [his or] her income in bad faith. In the context of alimony, bad faith means that the spouse is not living up to income potential in order to avoid or frustrate
 
 *606
 
 the support obligation. ... The trial court might also find bad faith, or the intent to avoid reasonable support obligations, from evidence that a spouse has refused to seek or to accept gainful employment; willfully refused to secure or take a job; deliberately not applied himself or herself to a business or employment; or intentionally depressed income to an artificial low.
 

 Works v. Works
 
 ,
 
 217 N.C. App. 345
 
 , 347,
 
 719 S.E.2d 218
 
 , 219 (2011) (citations and quotation marks omitted).
 

 On child support, both case law and the Child Support Guidelines address when income may be imputed:
 

 The North Carolina Child Support Guidelines state:
 

 If either parent is voluntarily unemployed or underemployed to the extent that the
 
 *217
 
 parent cannot provide a minimum level of support for himself or herself and his or her children when he or she is physically and mentally capable of doing so, and the court finds that the parent's voluntary unemployment or underemployment is the result of a parent's bad faith or deliberate suppression of income to avoid or minimize his or her child support obligation, child support may be calculated based on the parent's potential, rather than actual, income.
 

 The primary issue is whether a party is motivated by a desire to avoid his reasonable support obligations. To apply the earnings capacity rule, the trial court must have sufficient evidence of the proscribed intent. The earnings capacity rule can be applied if the evidence presented shows that a party has disregarded its parental obligations by:
 

 (1) failing to exercise his reasonable capacity to earn, (2) deliberately avoiding his family's financial responsibilities, (3) acting in deliberate disregard for his support obligations, (4) refusing to seek or to accept gainful employment, (5) willfully refusing to secure or take a job, (6) deliberately not applying himself to his business, (7) intentionally depressing his income to an artificial low, or (8) intentionally leaving his employment to go into another business.
 

 The situations enumerated are specific types of bad faith that justify the trial court's use of imputed income or the earnings capacity rule.
 

 *607
 

 Lueallen v. Lueallen
 
 , --- N.C. App. ----, ----,
 
 790 S.E.2d 690
 
 , 703-04 (2016) (citation, quotation marks, and ellipses omitted).
 

 Moreover,
 

 It is well established that child support obligations are ordinarily determined by a party's actual income at the time the order is made or modified. ...
 

 It is clear, however, that before the earnings capacity rule is imposed, it must be shown that the party's actions which reduced his income were not taken in good faith. Thus, where the trial court finds that the decrease in a party's income is substantial and involuntary, without a showing of deliberate depression of income or other bad faith, the trial court is without power to impute income, and must determine the party's child support obligation based on the party's actual income.
 

 Ellis v. Ellis
 
 ,
 
 126 N.C. App. 362
 
 , 364-65,
 
 485 S.E.2d 82
 
 , 83 (1997) (citations, quotation marks, and brackets omitted).
 

 Husband contends that the trial court erred by imputing income to him during various time periods covered by the order and requiring him to deplete his estate to pay alimony and child support as ordered during times when he was unemployed. He argues that the evidence and findings of fact do not show he acted in bad faith in his job search after his involuntary termination in January 2012. Husband also contends that the trial court had in prior orders "repeatedly endorsed [Husband's] efforts to seek a favorable recovery or settlement from his dispute with Company, and had also indicated in effect that [Husband's] pursuit of suitable executive-level re-employment would best meet the needs of the parties." He argues that in the order on appeal, "the trial court made an abrupt about-face, somersaulting over its previous approval of [Husband's] actions, and now harshly and unreasonably began blaming [Husband] for his 'bad faith' in 'purposely suppress[ing]' his income during his period of involuntary unemployment, as evidence of his 'willful disdain' for his support obligations."
 

 Perhaps seeking to minimize the apparent inconsistency in the trial court's treatment of Husband's unemployment over the course of the case since 2012, Wife responds by arguing that the trial court did not impute income based upon Husband's deliberate suppression of his income but instead imputed income based upon findings that Husband was "indulging himself in excessive spending because of a disregard of his marital obligation to provide reasonable support for his wife and
 
 *608
 
 children." In his reply brief, Husband addresses Wife's argument and notes that the trial court's findings do not establish that Husband had engaged in "excessive spending" but he had engaged in only "perfectly ordinary human behavior" such as getting married, buying a car, and buying a house.
 
 *218
 
 Although the trial court was not entirely clear on its reasons for imputing income-or even
 
 if
 
 it actually imputed income-Wife is correct that the trial court made findings which may support imputation of income based upon its determination that Husband had acted in deliberate disregard for his support obligations as of June 2013, when he unilaterally reduced his support payments to $300.00, in conjunction with his increases in spending which coincided with his new relationship with his girlfriend, now wife, although he was still unemployed. But if the trial court imputed income for this reason, the reason for imputation in 2012 remains in question. Although Husband was paying his support obligations then, there were pending motions to modify and Husband requested modification effective as of the date of his motion.
 

 The order on appeal is 38 pages long and has 136 paragraphs of findings of fact, plus the 21 attached child support worksheets for calculations for various time periods over the course of the case. Most of the findings are not challenged as unsupported by the evidence. Despite the extensive detail in the order, we have had difficulty reviewing the calculation of alimony and the modification of child support because the order does not include findings of Husband's expenses for any time period covered by the order, although there are findings as to Wife's and the children's expenses. In addition, as noted above, it is not clear if the trial court did actually impute income to Husband and if so, the basis for imputation during the various time periods.
 

 Husband challenges Findings 52, 53, and 61 and these findings of fact are important in the trial court's determination that Husband was willfully suppressing his income or acting in bad faith. Wife acknowledges that the date of settlement in the findings is incorrect, but argues these findings are unnecessary to support the trial court's order:
 

 52.
 
 On December 6, 2012,
 
 the federal judge in Richmond, Virginia, granted [Company's] motion to dismiss part of his lawsuit, including his request for punitive damages, attorney's fees and specific performance.
 

 53.
 
 Even after this devastating evisceration of his federal court action, Defendant Glenn Anthony Hill did not settle the [Company] lawsuit for another year.
 

 *609
 
 54. After [Company] terminated Defendant Glenn Anthony Hill from employment in January 2012, Defendant Glenn Anthony Hill sent out hundreds of resumes, networked with others in his industry, and worked with headhunters to search for executive or engineering jobs for which he is suited. He had job interviews in London, Malaysia, several in China and a few places in the United States.
 

 ....
 

 61. Defendant Glenn Anthony Hill's refusal to look for any work outside of executive or engineering positions for such an extended period of unemployment,
 
 his refusal to settle the [Company] lawsuit for a year
 
 after the adverse outcome in federal court, and his stubborn refusal to use his substantial estate to pay reasonable support shows a naïve indifference to fulfill support obligations and demonstrates a bad faith avoidance of his support obligations.
 

 (Emphasis added).
 

 Finding No. 52 incorrectly states the date of settlement of the lawsuit as 17 December 2012, but it was actually 17 December 2013. Thus, Husband settled the lawsuit with Company only
 
 eleven days
 
 after the "devastating evisceration of his federal court action" against Company, not over a year later. This is not a mere typographical error, as demonstrated by the trial court's Findings Nos. 53 and 61, which stress that his "refusal to settle" for a year after the adverse outcome shows his bad faith and "naïve indifference" to his support obligations. Settling only
 
 eleven
 

 days
 
 later would not show bad faith or "naïve indifference," at least not based upon an unreasonably prolonged pursuit of the lawsuit against Company. In contrast, Finding No. 54, above, indicates that Husband was working hard to find a new job: he "sent out hundreds of resumes, networked with others in his industry, and worked with headhunters to search for executive or engineering jobs for which he is suited" and "had job interviews in London, Malaysia, several in
 
 *219
 
 China and a few places in the United States." These findings and some others addressing Husband's efforts to find a new job seem inconsistent with the trial court's finding that Husband acted in bad faith. For example, the finding that Husband was diligently seeking a new "executive or engineering job for which he [was] suited"-apparently the entire time, since the finding does not indicate he ever stopped seeking a new job-seems to conflict with Finding No. 82:
 

 *610
 
 82. Despite submitting many applications for employment and his other efforts to secure a job in his field, considering his educational background and experience, his overall good health and age of 50 years, remaining unemployed continuously for 39 [sic, i.e., 42] months in a national economy on the upswing simply cannot be rationalized as a reasonable period of involuntary unemployment.
 

 That fact that Husband's job search took a long time does not mean it was in bad faith. Husband argues no evidence was presented to the trial court regarding the "national economy" from 2012 through 2016, and in particular, no evidence regarding the state of the industry or job market in which Husband was seeking employment. Our record does not even clearly identify the industry in which he was seeking a job because of the confidentiality agreement regarding Company, and the transcript also includes little information on his job.
 

 At the beginning of the trial, the parties addressed issues which may arise during trial regarding the confidentiality agreement and sealed records regarding Company and then made the following stipulation regarding Husband's job search:
 

 And we can also put on the record a further stipulation that the plaintiff acknowledges that Mr. Hill applied for in excess of probably 100 jobs for executive type positions for various companies across the United States and across the world seeking employment from-after his termination in January of 2012 until he got a job in July-or June of 2015.
 
 [2]
 

 Wife does not direct us to any evidence regarding the national economy, the job market, or the state of the industry in which Husband sought employment. Wife's response to Husband's argument is simply that "[Husband] purportedly futilely searched for an executive job for a period of nearly 3½ years." But Husband's search was not a "purported" search; it was a real search, at least according to Wife's stipulation and the trial court's Finding No. 54. Nor was his search "futile," although it may have been prolonged, since he did eventually find the executive-level job he was seeking. There is also no evidence that Husband was offered jobs but turned them down.
 

 *611
 
 This case is quite different from
 
 Lueallen
 
 , where this Court addressed imputation of income based upon the trial court's determination that the mother's continued unemployment for three years after she had voluntarily quit her job as a teacher.
 
 See generally
 

 Lueallen v. Lueallen
 
 , --- N.C. App. ----,
 
 790 S.E.2d 690
 
 . In
 
 Lueallen
 
 , the mother argued that she had been persistently seeking a new job, but the trial court found she had actually failed to apply for jobs in Mecklenburg County, despite her allegation she was "currently actively seeking" jobs there in her verified motion to modify child support.
 
 Id
 
 . at ----,
 
 790 S.E.2d at 704
 
 . There was also "extensive testimony at trial regarding Mother's educational and professional qualifications and her work history."
 
 Id
 
 . at ----,
 
 790 S.E.2d at 704
 
 . Based upon her quitting her prior job without having another job lined up, her failure to seek a new job for three years, and her job qualifications and experience, this Court affirmed the imputation of income.
 
 Id
 
 . at ----,
 
 790 S.E.2d at 704-05
 
 .
 

 An unsuccessful or prolonged job search after an involuntary job loss is not necessarily evidence of a bad faith suppression of income. For example, in
 
 Ludlam v. Miller
 
 ,
 
 225 N.C. App. 350
 
 ,
 
 739 S.E.2d 555
 
 (2013), both the husband and wife lost their jobs and had been unsuccessful in finding new jobs but the trial court imputed income to both husband and wife to set child support.
 

 *220
 
 This Court reversed the trial court's order and noted that
 

 [t]he trial court found that both Plaintiff and Defendant had searched for employment, but both had been unsuccessful. Less clear from the order is whether the trial court found that Plaintiff and Defendant had acted in bad faith. Our general impression is that the trial court found no bad faith. However, a literal reading of this finding of fact suggests that the trial court found bad faith which was insufficient to impute income at a prior income level, but that it found bad faith that was sufficient to impute income at the minimum wage. Neither of the above interpretations of the trial court's order would support imputation of income at minimum wage.
 

 Id
 
 . at 358,
 
 739 S.E.2d at 560
 
 .
 

 Based upon the prior orders for alimony and regarding discovery, Husband argues the trial court had recognized the need for Husband to pursue his job search for an "executive or engineering job" for which he was suited and to seek recovery for his termination from Company, but in its order, reversed course and found he should have settled his
 
 *612
 
 lawsuit with Company sooner and taken a lesser job instead of continuing to seek a job similar to his prior employment. For example, in the original 2012 alimony order, the trial court found
 

 10. Defendant was terminated from his employment in 2012 and has been offered a severance package that includes compensation of $255,000, vacation pay of $12,500 and a bonus ranging from $66,000 to $89,000. Defendant has not accepted this severance package as he believes that he may be entitled to more money and/or reinstatement of his position.
 
 Defendant is reasonably exercising his earning capacity and capabilities at the present time.
 

 (Emphasis added).
 

 Despite the trial court's finding
 
 in September 2012
 
 that "
 
 Defendant is reasonably exercising his earning capacity and capabilities at the present time
 
 ," in the order on appeal, the trial court found that "Defendant Glenn Anthony Hill's
 
 naive indifference to earn any income from January 2012 to July 2015 is not justified
 
 ." (Emphasis added). These findings are contradictory, at least for 2012. The trial court could perhaps find that Husband
 
 was
 
 reasonably exercising his earning capacity in 2012, even though he was unemployed and seeking a new job, but at some point between 2012 and 2015, his delay in finding a new job became unreasonable. We cannot determine from the order the point when this change occurred. And this date, if it exists, would be important, because it may be a pivotal date for purposes of looking back to impute income to Husband based upon bad faith in his job search and for modifying his support obligations.
 

 Although the trial court was sympathetic to Husband's job search in 2012, it appears from the 2016 order that the trial court changed its view of Husband's continued unemployment. The prior order was entered in 2012, but Husband's unemployment continued until June of 2015. And based on other findings of fact, as Wife contends, the trial court might have based its imputation of income on Husband's excessive spending "in deliberate disregard for his support obligations" even while he was still unemployed and at the same time, unilaterally reducing his monthly payments to Wife from $8,000.00 to $300.00-although as noted above, this still cannot explain the trial court's failure to modify the support obligations prior to June 2013.
 

 The trial court detailed the unexplained decreases in Husband's bank account balances along with the drastic changes in Husband's lifestyle beginning in 2013, which coincided perfectly with his decision to
 
 *613
 
 reduce his payments by 96%, to $300.00 and with meeting his girlfriend. Husband still had a balance of over $100,000.00 in his bank account as of the end of 2012, and on 12 March 2013, he paid $27,300.00 cash for a 2009 BMW two-door convertible.
 
 [3]
 
 By the end of May 2013, his bank account was down to just over $26,000.00-a decrease of $46,700.00 in just two
 
 *221
 
 and half months, although Husband was still "purportedly liv[ing] frugally" in a one bedroom of a home at that time. At just about this time, Husband met his girlfriend, now wife, on Match.com. In October 2013, Husband filled out a lease application for a new apartment in High Point where he stated his income as $150,000.00 per year from GA Hill and Associates-although he testified he received no income from this business.
 
 [4]
 

 A few months later, in January 2014, Husband received the proceeds from the settlement with Company, and he deposited $251,098.95 into his savings account. By the end of January, Husband had withdrawn $110,500.00 from the savings account-but he paid Wife only $300.00 that month. By February 2014, he had moved to the apartment in High Point with his girlfriend. In June 2014, Husband got $6,000.00 as a gift from his father to buy an engagement ring for his new girlfriend. In November 2014, he married her, and they had two formal weddings, one in Raleigh and one in China. By the end of 2014, his bank account balance was down to $28,472.60-and he was still paying Wife $300.00 per month. And even after Husband got his new job in June 2015, he still did not resume paying alimony.
 

 In addition, several findings note that the trial court determined Husband was not credible in his testimony and evidence regarding financial matters, including "his credit card debt or other loans" and his testimony about his new wife's "income and employment status and her ability to share in the cost of their living expenses." And as Wife stresses, the trial court found that Husband "indulged in excessive and unnecessary spending when he moved to High Point with his girlfriend (now his wife) and even more so when they moved to Reno, and continued to avoid his financial obligations to support his children and his ex-wife."
 

 *614
 
 Husband responds that the findings do not address why it is "excessive and unnecessary spending" to get remarried and, after getting a new job, to buy a new house near his new job. The definition of "excessive" spending will vary depending upon the parties' circumstances and certain types of expenses, such as housing and food, are necessities.
 
 See, e.g.,
 

 Beall v. Beall
 
 ,
 
 290 N.C. 669
 
 , 678-79,
 
 228 S.E.2d 407
 
 , 413 (1976) ("While some of [defendant's living expenses] appear to be extravagant, or overestimated, and several might be eliminated, others are essential. Thus, if only the projected monthly rent ($190.00); food ($100.00); utilities ($35.00) and car payments ($204.00) are counted, defendant would still need $529.00 monthly ($6,348.00 annually) to support himself. However, income taxes, automobile insurance, and laundry must be paid; most certainly he will have medical expenses and other unexpected demands for money from time to time. Even so, his projected monthly expenditures of $1,789.00 are beyond his means. We note that considered on an annual basis these expenses exceed defendant's total maximum income as found by the trial court."). Husband argues that the trial court did not distinguish what amounts, if any, of his expenditures were "extraordinary overspending" as opposed to reasonable living expenses. But the trial court's findings carefully detail Husband's bank account balances over time along with his actions in disregard of his support obligations. Husband was free to remarry, but payment of alimony or child support "may not be avoided merely because it has become burdensome, or because the husband has remarried and voluntarily assumed additional obligations."
 
 Crosby v. Crosby
 
 ,
 
 272 N.C. 235
 
 , 238,
 
 158 S.E.2d 77
 
 , 80 (1967) (citations and quotation marks omitted);
 
 see also
 

 Frey
 
 ,
 
 189 N.C. App. at 630
 
 ,
 
 659 S.E.2d at 67
 
 ("Payment of support for a child of a former marriage may not be avoided merely because the husband has remarried and thereby voluntarily assumed additional obligations. Increases in expenses that were voluntarily assumed additional obligations, including entering into another marital and family relationship, although they may render
 
 *222
 
 the child support payments more burdensome, do not justify a reduction in such payments." (Citations, quotation marks, brackets, and ellipses omitted) ). These findings of Husband's reduction in support payments coupled with his increased spending on his new life with his girlfriend and his ultimate remarriage primarily focus on the period when he was unemployed. Once he had a new job, there was no need for the trial court to impute income, and it did not, so his expenses based upon his remarriage, if any, did not affect the support calculations as reflected by the order after he began working for Ebara.
 

 Yet we still have some concern about whether the erroneous finding of the date of Husband's settlement with Company was a significant
 
 *615
 
 factor in the trial court's determination that Husband acted in bad faith and in its imputation of income to Husband. "In orders of child support, the trial court should make findings specific enough to indicate to the appellate court that due regard was taken of the requisite factors."
 
 Burnett v. Wheeler
 
 ,
 
 128 N.C. App. 174
 
 , 176,
 
 493 S.E.2d 804
 
 , 806 (1997). Based on Findings Nos. 52, 53, and 61, it is possible that the trial court's change of attitude toward Husband's extended job search was influenced by the belief he had delayed the settlement for over a year after it would be reasonable and responsible to resolve the lawsuit, so he would have the funds from the settlement available, and the potential cloud hanging over his ongoing job search could be removed. In addition, although the trial court may have relied upon Husband's excessive spending in disregard of his support obligations as of June 2013, when he unilaterally reduced his support dramatically, his motion to modify child support extends back to March 2012. Even though he was still paying as ordered in March 2012, he could have been entitled to a reduction for any time period when he was involuntarily unemployed and not excessively spending or acting in bad faith. Because we cannot determine whether the trial court imputed income and the basis for imputation for each of the time periods, and especially prior to June 2013, we must remand to the trial court for correction of the date of the settlement with company and any revisions the trial court deems appropriate to the other challenged findings which rely on the erroneous date. If the trial court imputes income, it should state the basis for imputation for each time period.
 

 We therefore reverse the trial court's erroneous findings regarding the date of the settlement with Company and related findings regarding Husband's delay in settlement and the imputation of income to Husband based on this refusal. On remand, the trial court shall correct the findings regarding the date of settlement and make any additional findings it deems fit based upon the correct date. In addition, the trial court shall clarify whether it imputed income to Husband from January 2012 until July 2015 and make any additional findings it deems fit regarding imputation of income, if the trial court is basing the support obligations upon imputation of income based upon bad faith or suppression of income.
 

 B. Averaging of income
 

 Husband also argues that instead of imputing income, the trial court relied upon funds Husband actually received while he was unemployed, averaged retroactively over the period of unemployment. In the order,
 
 *616
 
 one analysis of Husband's income finds that he had no income for many months, but the trial court still kept the child support obligation at the same amount as it had been when Husband was earning over twice what he eventually began earning at his new job at Ebara and reduced alimony only by $1,000.00 per month. The trial court also did another analysis of Husband's income, finding an average income over 34 months of $13,432.00 per month.
 

 Because the trial court considered the settlement funds from the Company and his new job in determining whether he was entitled to any reduction of either support obligation, Husband argues that "[t]his case exemplifies the perils of adjudication with '20/20 hindsight,' " and specifically, the prejudice that arises when adjudication of a motion to modify is long delayed-in this case, roughly four years. He argues that by averaging out funds retroactively over the nearly four year period, the trial court was penalizing Husband for failure to pay in 2012 and
 
 *223
 
 2013 as if he actually had those funds in 2012 and 2013. If Husband's motions to modify had been heard in 2012-before he had received any settlement funds, before he got a new job, and before he had even met his new wife-the circumstances would have been much different. His job search had not been going on for long, and there would have been no way to know when he would actually find a job or how much it would pay, or when his lawsuit against Company would be resolved and how much the recovery would be.
 

 Ultimately, the trial court found that "[d]espite his extended unemployment, there has been no significant change in [Husband]'s ability to pay child support to [Wife] since entry of the Order." In other words, the trial court found that although Husband was earning $543,000.00 per year when the order was entered in 2011, and he was unemployed with no income for 42 months, and he got a new job in July 2015 making about half what he had been making in 2011, his ability to pay was not significantly changed even while he had no income. Mathematically, these numbers present an obvious question: how is an involuntary decrease in income from $543,000.00 to zero not a significant change? During the 42 months Husband was unemployed, he would have needed $336,000.00 to pay the $8,000.00 per month he was required to pay. His only income during that time was the settlement from Company, in a gross amount of $351,937.52; his net income left after taxes was $251,098.95. He also had to pay attorney fees related to the settlement of $29,000.00, leaving him with $213,000.00. Even if he had used all of the settlement funds to pay his support obligations, he would still have had a shortfall of $123,000.00. The trial court dealt with this mathematical
 
 *617
 
 problem by finding that "[t]he fact that [Husband's] income decreased does not mean that he is entitled to a reduction in alimony or child support, especially when the needs of the minor children and [Wife] did not decrease (and actually increased) and he is able to make the payment as originally ordered by using his estate, notwithstanding his reduction in income." The trial court recognized that Husband would have to deplete his estate to pay his support obligations.
 

 In Finding No. 40, the trial court noted that in January 2012, Husband's Wells Fargo checking account had a balance of $363,227.36; he then transferred $300,000.00 from this account to a Wells Fargo savings account. By 31 August 2013, this savings account was depleted down to $6,009.94. The findings then detail various other bank account balances, deposits and withdrawals. The trial court found that "[d]uring this period, [Husband's] total monthly support obligation to [Wife] was $8,000.00" and at that time, Husband was living "frugally" in one bedroom apartments and he "offered no explanation as to how or why he dissipated his large cash accounts." In June 2013, Husband stopped paying his support as ordered and paid only $500.00 that month, then paid only $300.00 per month from July 2013 to June 2015.
 

 These findings show that Husband stopped receiving income as of January 2012, but continued to pay $8,000.00 support each month through May 2013, a period of 17 months. Thus, he paid out $136,000.00 to Wife, which would explain at least that portion of the depletion of his bank account, but would still leave $227,227.36. Husband's living expenses at that time were low, and the trial court is correct that Husband was depleting his account at a rate far beyond the amount needed to pay support, with no explanation of how he may have spent the additional $227,227.36. In summary, the trial court determined that Husband still had or should have had sufficient funds to continue paying support as originally ordered by depleting his estate. It is correct that he could continue to pay $8,000.00 per month, despite having no income, for a finite period with his savings account. The trial court also made findings regarding his remaining estate, although Husband notes those findings show that most of his remaining funds were in 401K accounts or other retirement accounts not readily accessible without incurring substantial taxes and penalties. The question is whether his support obligations can be set based upon depletion of his estate so that he must continue to pay support at the level set when his income was over $500,000 per year, even when he had no income.
 

 *618
 

 *224
 
 C. Depletion of Estate
 

 (1) Alimony
 

 The original consent order entered on 15 March 2011 and the alimony order entered on 12 September 2012 both required Husband to pay alimony of $4,500.00 per month. The order on appeal reduced alimony to $3,500.00 per month, effective as of 1 October 2012. Although the trial court reduced his alimony obligation, Husband argues that the trial court abused its discretion by not reducing his alimony sufficiently. His income was over $500,000.00 annually when the $4,500.00 obligation was established, but he had no income other than the settlement proceeds from 12 January 2012 until 29 June 2015, when he was hired by Ebara. Again, husband argues the trial court based the modified alimony on hindsight, since by the time of trial, his period of unemployment had ended. Wife essentially acknowledges the trial court's hindsight, arguing that "to whatever extent [Husband] had no income on the date that he filed his motion to modify alimony, that condition was cured by the Company Lawsuit settlement he received in early 2014 and his employment with Ebara in July 2015." She argues the trial court made extensive findings of Husband's "excessive and unnecessary spending to avoid his support obligations" during his period of unemployment and acted within its discretion in modifying alimony.
 

 An alimony order "may be modified or vacated at any time, upon motion in the cause and showing of changed circumstances by either party or anyone interested."
 
 N.C. Gen. Stat. § 50-16.9
 
 (a) (2017). The party moving for a modification bears the burden of showing "a substantial change in conditions" so "the present award is either inadequate or unduly burdensome."
 
 Britt v. Britt
 
 ,
 
 49 N.C. App. 463
 
 , 470,
 
 271 S.E.2d 921
 
 , 926 (1980). We review the trial court's determination of the amount of alimony for abuse of discretion.
 
 See, e.g.,
 

 Kelly v. Kelly
 
 ,
 
 228 N.C. App. 600
 
 , 601,
 
 747 S.E.2d 268
 
 , 272-73 (2013) ("Decisions regarding the amount of alimony are left to the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a manifest abuse of that discretion. When the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. An abuse of discretion has occurred if the decision is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." (Citations omitted) ).
 

 When setting alimony, the trial court must consider and make findings of fact on the factors in
 
 N.C. Gen. Stat. § 50-16
 
 .3A (2017), but if the
 
 *619
 
 trial court has made the required findings, the amount of alimony is not reviewable absent an abuse of discretion.
 
 See
 

 Works
 
 ,
 
 217 N.C. App. at 350
 
 ,
 
 719 S.E.2d at 221
 
 ("It is well-established that the amount of alimony is determined by the trial judge in the exercise of her sound discretion and is not reviewable on appeal in the absence of an abuse of discretion, and that a ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." (Citations, quotation marks, and brackets omitted) ). To modify an alimony obligation set by a prior order, the trial court must compare the current financial situation to the time when the prior alimony order was entered, to see if there has been a change in the financial needs of the dependent spouse or in the ability to pay of the supporting spouse:
 

 As a general rule, the changed circumstances necessary for modification of an alimony order must relate to the financial needs of the dependent spouse or the supporting spouse's ability to pay.
 

 ....
 

 To determine whether a change of circumstances under G.S. 50-16.9 has occurred, it is necessary to refer to the circumstances or factors used in the original determination of the amount of alimony awarded under G.S. 50-16.5. That statute requires consideration of the estates, earnings, earning capacity, condition, accustomed standard of living of the parties and
 
 *225
 
 other facts of the particular case in setting the amount of alimony.
 

 Rowe v. Rowe
 
 ,
 
 305 N.C. 177
 
 , 187,
 
 287 S.E.2d 840
 
 , 846 (1982) (citations omitted).
 

 As a general rule, a supporting spouse will not be required to deplete his estate to pay alimony.
 
 See, e.g.,
 

 Beaman v. Beaman
 
 ,
 
 77 N.C. App. 717
 
 , 722,
 
 336 S.E.2d 129
 
 , 132 (1985) ("Ordinarily, the parties will not be required to deplete their estates to pay alimony or to meet personal expenses."). But sometimes, where the estate of the dependent spouse is not sufficient to meet her reasonable needs, and the estate of the supporting spouse is not sufficient to meet his own needs in addition to payment of alimony, the trial court may consider whether depletion of the supporting spouse's estate would be fair.
 
 See, e.g.,
 

 Swain v. Swain
 
 ,
 
 179 N.C. App. 795
 
 , 799,
 
 635 S.E.2d 504
 
 , 507 (2006). Although some cases from our Supreme Court
 

 *620
 
 appear to disfavor alimony awards that result in estate depletion for one party or the other, those decisions by no means prohibit such awards. Rather, all of these cases cite "fairness and justice to all parties" as the principle to which an alimony award must conform. Thus, we consider whether the court's award in the present case is fair to all of the parties.
 

 Id.
 

 (citations omitted).
 

 In considering whether depletion of the estate is fair, the trial court must compare the estates and needs of the parties.
 
 See generally
 

 id
 
 . In prior cases, some of the important factors were the difference between the estates, the rate at which each party would need to deplete his or her estate, the prospects for either party to improve his or her earnings in the future, and the term of payment of the alimony.
 
 See
 

 id
 
 . ("Considering that plaintiff's estate is substantially larger than defendant's estate, it would be unfair to require defendant to further deplete her estate while allowing plaintiff to maintain his. Instead, the trial court ordered a reduction in alimony from $4,300 per month to $3,600 per month. This award does not fully meet defendant's living expenses and is greater than plaintiff's disposable income after meeting his own expenses. Because the award requires both parties to deplete their estates to meet their living expenses, the trial court's reduction of alimony was fair to both parties, and the trial court did not abuse its discretion.").
 

 In
 
 Williams v. Williams
 
 , this Court discussed the comparison of estates of the dependent and supporting spouses:
 

 The financial worth or "estate" of both spouses must also be considered by the trial court in determining which spouse is the dependent spouse. We do not think, however, that usage of the word "estate" implies a legislative intent that a spouse seeking alimony who has an estate sufficient to maintain that spouse in the manner to which he or she is accustomed,
 
 [t]hrough estate depletion
 
 , is disqualified as a dependent spouse. Such an interpretation would be incongruous with a statutory emphasis on "earnings," "earning capacity," and "accustomed standard of living." It would also be inconsistent with plain common sense. If the spouse seeking alimony is denied alimony because he or she has an estate which can be spent away to maintain his or her standard of living, that spouse may soon have no earnings or earning capacity and therefore no way to maintain
 
 any
 
 standard of living.
 

 *621
 
 We think, therefore, that the trial court consideration of the "estates" of the parties is intended primarily for the purpose of providing it with another guide in evaluating the earnings and earning capacity of the parties, and not for the purpose of determining capability of self-support through estate depletion. We think this is equally true in giving consideration to the estate of the alleged supporting spouse. Obviously, a determination that one is the supporting spouse because he or she can maintain the dependent spouse at the standard of living to which they were accustomed through estate depletion could soon lead to inability to provide for either party.
 

 Defendant argues that awarding alimony to this plaintiff would result in maintaining "not the wife, but her wealth." He argues that compelling the husband to build up by alimony a "treasure hoard for the wife" has been consistently rejected.
 

 *226
 
 Nothing in this decision is designed to allow plaintiff to increase her wealth at the expense of defendant. Under the guidelines established, plaintiff would be required to continue in expending
 
 all
 
 of her annual income if she desires to maintain her present standard of living. Should the wife's capital assets increase in value, through inflation, prudent investment or otherwise, and results in an increase of her income, defendant would, of course, be entitled to petition the court for modification of the alimony order under G.S. 50-16.9.
 

 Williams v. Williams
 
 ,
 
 299 N.C. 174
 
 , 183-84,
 
 261 S.E.2d 849
 
 , 856-57 (1980) (citations omitted).
 

 Here, the trial court made extensive and detailed findings of fact comparing the financial circumstances of the parties, addressing all of the factors under
 
 N.C. Gen. Stat. § 50-16
 
 .3A. Relevant to Husband's argument regarding depletion of his estate, the trial court made findings comparing: (1) Husband's excessive spending, failure to pay any alimony, and voluntary increase in living expenses while still unemployed to Wife's reduction of her living expenses; (2) Husband's substantial estate even after his period of unemployment to Wife's depletion of her estate; (3) Husband's high income to Wife's much lower income; and (4) the time period of the alimony payments.
 

 In regards to the time period of the alimony payments, the term was set as 10 years from the initial order in 2012, so Husband's obligation
 
 *622
 
 will end in 2022, unless sooner modified based on future changes or terminated by Wife's remarriage or death. The trial court did have the benefit of hindsight in considering the extent to which Husband would need to deplete his estate to pay alimony over the entire ten-year term, most of which is now past. But for purposes of considering the fairness of the alimony award overall, it was proper for the trial court to take Husband's current job and earnings into account, even for prior years. As of the date of hearing, Husband was employed and now has adequate earnings to continue paying current alimony as ordered with little if any ongoing depletion of his estate; he also has the ability to pay the accrued alimony without an unreasonable depletion of his estate. In comparison, Wife has already depleted much of her estate, despite her reduction in her living expenses, and since her income is not sufficient to meet her reasonable needs, she would quickly deplete the remainder of her estate and still could not maintain herself without alimony as ordered. The trial court did not abuse its discretion by basing the alimony award on a combination of Husband's estate and his current income, recognizing that his estate would be depleted to maintain the alimony obligation during his time of unemployment, even in the absence of bad faith or imputation of income for purposes of alimony. The trial court correctly considered the comparison of the estates of the parties for purposes of modification of alimony and did not abuse its discretion in modifying alimony effective back to the date of Husband's motion to modify alimony based upon depletion of his estate.
 

 (2) Child Support
 

 Although depletion of Husband's estate may be a proper basis to establish the alimony obligation, the same is not necessarily true for child support. On child support, as discussed above, it appears the trial court may have used either imputation of income or averaging of income over Husband's period of unemployment. Wife argues that although the trial court could have imputed income for purposes of child support, "the Order itself also reveals that the trial court did not actually impute income for purposes of modifying [child support]." Although depletion of Husband's estate can be appropriate as to alimony, based upon the factors the trial court may consider under
 
 N.C. Gen. Stat. § 16
 
 .3A in setting alimony, those factors do not apply to child support. We cannot find any cases allowing an award of child support based solely on depletion of the payor's estate
 
 absent
 
 bad faith or suppression of earning capacity. Therefore, the trial court was not authorized to base the child support modification prior to Husband's new job with Ebara
 
 solely
 
 upon depletion of his estate, and we must remand for additional findings to clarify
 
 *623
 
 whether the trial court is actually imputing income for purposes of child support,
 
 *227
 
 and if so, the basis for imputing income for each time period.
 

 D. Mathematical error in alimony arrears
 

 Husband also argues that the trial court made a mathematical error in the calculation of his alimony arrears. The trial court found Husband owed 35 payments of alimony of $3,500.00 per month from June 2013 until March 2016, but alimony was reduced effective as of 1 October 2012. From October 2012 to May 2013, Husband paid eight payments of $4,500.00 per month, or $1,000.00 per month more than the modified obligation, so he actually paid $8,000.00 for which he was not given credit in the order. Wife did not respond to this argument in her brief. On remand, the trial court should correct this mathematical error and determine the correct amount of alimony arrears owed.
 

 II. Civil Contempt
 

 A. Application of N.C. Gen. Stat. § 5A-21
 

 Husband first argues the trial court erred as a matter of law by holding him in contempt based upon "its application of the civil contempt statute." (Original in all caps). Husband's argument is based upon N.C. Gen. Stat. § 5A-21(a) (2017):
 

 (a) Failure to comply with an order of a court is a continuing civil contempt as long as:
 

 (1) The order remains in force;
 

 (2) The purpose of the order may still be served by compliance with the order;
 

 (2a) The noncompliance by the person to whom the order is directed is willful; and
 

 (3) The person to whom the order is directed is able to comply with the order or is able to take reasonable measures that would enable the person to comply with the order.
 

 N.C. Gen. Stat. § 5A-21(a)(1)-(3).
 

 The order on appeal held Husband in contempt for his failure to pay child support and alimony "from June 2013 through March 2016," and for failure to pay the children's uninsured health care costs "through March 2016." But the same order also modified Husband's alimony obligation effective as of 1 October 2012. (His child support obligation was not modified during the time he was unemployed, although as discussed
 
 *624
 
 above, it is possible that it may be modified on remand.) Therefore, the contempt period overlaps with the modification period. Husband argues that he was held in contempt of orders "that were either in whole or in part no longer in effect as of the dates for which the contempt was assessed," in violation of N.C. Gen. Stat. § 5A-21(a)(1) and (2) "because these orders did not 'remain[ ] in force' at the operative time of the supposed contempt."
 

 Neither Husband nor Wife cites any cases directly relevant to Husband's argument that he cannot be held in contempt of a prior order simultaneously with the modification of the prior order. Of course, Husband is the party who moved to modify the prior orders asking to decrease his support obligations effective as of the date of his filing of the motion to modify. It is well-established that the trial court may modify a support obligation effective as of the date of the motion requesting modification.
 
 See, e.g.,
 

 Mackins v. Mackins
 
 ,
 
 114 N.C. App. 538
 
 , 546,
 
 442 S.E.2d 352
 
 , 357 (1994) ("[J]ust as the trial court has the discretion to modify an alimony award as of the date the petition to modify is filed, the trial court also has the discretion to modify a child support order as of the date the petition to modify is filed.").
 

 Husband bases his argument on the language of N.C. Gen. Stat. § 5A-21(a)(1)-(3), so we must interpret this statute. Statutory interpretation presents a question of law, which we review
 
 de novo
 
 :
 

 We review issues of statutory construction de novo. In matters of statutory construction, our primary task is to ensure that the purpose of the legislature, the legislative intent, is accomplished. Legislative purpose is first ascertained from the plain words of the statute. A statute that is clear on its face must be enforced as written. Courts, in interpreting the clear and unambiguous text of a statute, must give it its plain and definite meaning, as there is no room for judicial construction. ...
 

 In applying the language of a statute, and because the actual words of the legislature are the clearest manifestation of its intent,
 
 *228
 
 we give every word of the statute effect, presuming that the legislature carefully chose each word used. Finally, we must be guided by the fundamental rule of statutory construction that statutes in pari materia, and all parts thereof, should be construed together and compared with each other.
 

 In re Ivey
 
 , --- N.C. App. ----, ----,
 
 810 S.E.2d 740
 
 , 744 (2018) (citations, quotation marks, and brackets omitted).
 

 *625
 
 Under the plain words of the statute, failure to comply with an order may be contempt if "(1) The order remains in force"; and "(2) The purpose of the order may still be served by compliance with the order." N.C. Gen. Stat. § 5A-21(a)(1)-(2). Husband argues that because the trial court modified alimony obligation in the prior order effective as of the filing of his motion-at his request-the prior order was no longer "in force" as of the date of the order holding him in contempt.
 
 See
 

 id
 
 . But the child support and alimony orders did not disappear, and there has been a support order "in force" continuously since the entry of the first order.
 
 Id
 
 . If we read subsection (1) along with subsection (2), the modification of some portions of the prior order does not necessarily render it impossible for Husband to be held in contempt for failure to pay his support obligations because the order is still "in force."
 
 Id
 
 . It is clear that "[t]he purpose of the order" is "still ... served by compliance with the order."
 
 Id
 
 . The purpose of the order was and is to provide support for Wife and the children; even if the exact amount of the support obligation in the prior order changed, the other portions of the order were unchanged. A modification of an order effective as of a date in the past is to some extent a legal fiction; it has the legal effect of reaching back to change the past, but in reality, the past cannot change.
 

 We must also consider the remainder of the statute along with the modifications of the order. To be held in contempt, "(2a) The noncompliance by the person to whom the order is directed [must be] willful; and "(3) The person to whom the order is directed [must be] able to comply with the order or is able to take reasonable measures that would enable the person to comply with the order."
 
 Id
 
 . Depending upon the particular modification of an order, it would be possible that the noncompliance could not be considered "willful."
 
 Id
 
 . For example, if an order were modified to increase a support obligation, the payor could not be held in contempt for failure to pay the increased amount in the past, as that failure to pay more in the past could not be willful. Here, the trial court's modification was a reduction of alimony-and child support remained the same-so the prior order "remained in force" for the child support obligation and for alimony up to the newly reduced amount of $3500.00.
 
 Id
 
 . Had Husband failed to pay his full alimony obligation as previously ordered, $4,500.00, but did pay as much as the new reduced amount of $3,500.00, he could not be held in contempt, since in such a scenario, Husband would have paid as much as required under the modified order-even if the motion for contempt was filed before the order was modified and he was obligated at the time to pay a greater amount.
 

 In addition, the purpose of N.C. Gen. Stat. § 5A-21 particularly in the context of child support and alimony enforcement, could be subverted
 
 *626
 
 by Husband's interpretation of the statute. Where a child support or alimony obligor has valid reason for a reduction of his obligation, he could simply file a motion to modify the support obligation and stop paying support entirely until the trial court enters an order. In the meantime, the recipient of the support could file a motion to hold him in contempt, but he may be insulated from being held in contempt, even if he paid nothing, if the order is later modified effective as of the date of his motion. Although a payor has the right to file a motion to reduce his obligation and may have that reduction effective back to the date of filing, he does not have the right to entirely avoid his support obligation until the motion is heard simply by moving for modification.
 
 See generally
 

 Chused v. Chused
 
 ,
 
 131 N.C. App. 668
 
 , 672-73,
 
 508 S.E.2d 559
 
 , 562 (1998) ("A supporting parent has no authority to unilaterally modify the amount of the court ordered child support payment. The supporting parent must first apply to the trial court for
 
 *229
 
 modification. The trial court then has the authority to enter a modification of court ordered child support, retroactive to the filing of the petition of modification. If a person unilaterally reduces his court ordered child support payments, he subjects himself to contempt." (Citations, quotation marks, and brackets omitted) ). Thus, the trial court did not err by holding Husband in contempt of the prior orders while also setting his arrears owed based upon the modified alimony obligation. Nevertheless, because we must remand for a new order addressing the modification of child support and alimony arrearages as discussed above, it is possible that the amounts of arrears and purge payments may change. We therefore must also reverse and remand the contempt order so the trial court may address whether Husband is in willful civil contempt and if so, to determine the revised amounts of arrearages owed and purge conditions in the new order.
 

 B. Notice of acts of noncompliance
 

 Husband's second argument on contempt is that he did not have notice of the acts for which he may be held in contempt because the Motion and Show Cause Order were both filed on 31 July 2013. He argues that the Motion gave notice of alleged noncompliance only up to 31 July 2013, but the trial court held him in contempt for failure to pay child support and uninsured medical costs which accrued after that date.
 

 Wife argues that Husband waived any argument on notice of the acts for which he may be held in contempt by failing to raise this objection at trial. We agree. Where Husband actively participated in the trial without raising any objection or argument regarding notice of the acts for which he may be held in contempt, he has waived this argument on appeal.
 
 See
 

 Watson v. Watson
 
 ,
 
 187 N.C. App. 55
 
 , 63,
 
 652 S.E.2d 310
 
 , 316 (2007)
 

 *627
 
 ("[D]efendant did not object to the presentation of evidence on this issue at the contempt hearing. On the contrary, defendant presented evidence relating to the credit card debt, including offering exhibits. When the contemnor comes into court to answer the charges of the show cause order, she waives procedural requirements. Defendant's active participation in the hearing on this issue, without objection, defeats her contention that she was without notice that the 5 June 2006 proceeding would include a review of her failure to take responsibility for the credit card payments." (Citations, quotation marks, and brackets omitted) );
 
 see also
 

 Byrd v. Byrd
 
 ,
 
 62 N.C. App. 438
 
 , 443,
 
 303 S.E.2d 205
 
 , 209 (1983) ("[W]hen issues not raised in the pleadings are tried by the express or implied consent of the parties, North Carolina allows for the pleadings to be amended to conform to the evidence. Where a party offers evidence at trial which introduces a new issue and there is no objection by the opposing party, the opposing party is viewed as having consented to the admission of the evidence and the pleadings are deemed amended to include the new issue." (Citation omitted) ). In this case, Husband participated in the trial on the issues of contempt up to the date of the hearing without objecting to any of this evidence or claiming any lack of notice. Accordingly, this argument is without merit.
 

 III. Award of Attorney Fees
 

 Finally, Husband argues that the trial court erred as a matter of law "in ordering defendant to pay plaintiff's attorney's fees as a 'combined' award and otherwise in contravention of the applicable statutes." (Original in all caps). Husband contends that because the fee award of $50,000.00 did not differentiate between the amounts awarded for each claim-modification of child support, modification of alimony, and contempt-this Court is unable to determine Wife's entitlement to the entire award. Husband also argues that the trial court erred in awarding fees for various reasons for each claim: child support modification, alimony modification, and contempt. As explained in more detail below, if there were adequate findings to support Wife's entitlement to attorney fees on all three claims, the award would be proper, but there are a few missing pieces, so we must vacate the award and remand to the trial court for additional findings, conclusions of law, and a new order as appropriate based on those findings and conclusions.
 

 We review the trial court's determination that Wife is entitled to an award of
 
 *230
 
 attorney fees based upon
 
 N.C. Gen. Stat. § 50-13.6
 
 (2017)
 
 de novo
 
 , since this is a question of law, and we review the amount of the fees for abuse of discretion:
 

 *628
 
 In a custody suit or a custody
 
 and
 
 support suit, the trial judge, pursuant to the first sentence in G.S. 50-13.6, has the discretion to award attorney's fees to an interested party when that party is (1) acting in good faith and (2) has insufficient means to defray the expense of the suit. The facts required by the statute must be alleged and proved to support an order for attorney's fees. Whether these statutory requirements have been met is a question of law, reviewable on appeal. When the statutory requirements have been met, the amount of attorney's fees to be awarded rests within the sound discretion of the trial judge and is reviewable on appeal only for abuse of discretion. ...
 

 When the action is
 
 solely
 
 one for support, all of the requirements set forth in part III A above apply
 
 plus
 
 the second sentence in G.S. 50-13.6 which requires that there be an additional finding of fact that the party ordered to furnish support has refused to provide support which is adequate under the circumstances existing at the time of the institution of the action or proceeding. A finding of fact supported by competent evidence must be made on this issue in addition to meeting the requirements of good faith and insufficient means before attorney's fees may be awarded in a support suit. This issue is a question of law, reviewable on appeal.
 

 Hudson v. Hudson
 
 ,
 
 299 N.C. 465
 
 , 472-73,
 
 263 S.E.2d 719
 
 , 724 (1980) (citations, quotation marks, and brackets omitted).
 

 Husband argues that the trial court erred as a matter of law in awarding attorney fees on all three claims. He does not challenge the amount of the award except to note that since the award is undifferentiated, it is impossible to break it down into portions awarded for each claim, so if the trial court erred in awarding fees for even one of the three claims, the award cannot stand.
 

 A. Entitlement to fees for modification of child support
 

 North Carolina General Statutes Section 50-13.6 sets forth the statutory requirements for an award of attorney fees in child support claims:
 

 Before ordering payment of a fee in a support action,
 
 the court must find as a fact that the party ordered to furnish support has
 
 refused to provide support
 
 which is
 
 *629
 
 adequate
 
 under the circumstances existing at the time of the institution of the action or proceeding. ...
 

 N.C. Gen. Stat. § 50-13.6
 
 (emphasis added).
 

 The trial court found: "128. [Husband] refused to provide support which is adequate under the circumstances." The trial court did not include the last portion of the finding required by
 
 N.C. Gen. Stat. § 50-13.6
 
 : "
 
 existing at the time of the institution of the action or proceeding.
 
 "
 
 See id
 
 . Husband argues that the "time of the institution of the action or proceeding" was when he filed his motion to modify child support, 7 February 2012.
 
 Id
 
 . The circumstances existing as of February 2012 were that both Husband and Wife were unemployed
 
 and
 
 Husband was still paying his full child support as required by the order. Wife relies upon the definition of an "action" from Black's Law Dictionary,
 
 see action
 
 , Black's Law Dictionary (10th ed. 2014), to argue that "the appropriate time for measuring the adequacy of Defendant's support pursuant to [N.C. Gen. Stat.] § 50-13.6 was July 31, 2013 [when she filed a motion for contempt] through the time of trial in April 2016 ...." During that time period, Wife argues, Husband had "started his spending spree" and "had access to sufficient cash from his estate."
 

 We cannot find any case which specifically defines the phrase "at the time of the institution of the action or proceeding,"
 
 N.C. Gen. Stat. § 50-13.6
 
 , perhaps because this simple phrase has not been at issue in any prior case. But many cases refer to the dates when various types of actions or proceedings were
 
 instituted,
 
 and invariably, the cases use the date when a pleading or motion bringing a claim or seeking a particular type of relief was filed with the court as the date of the "institution of the action or proceeding."
 

 *231
 

 N.C. Gen. Stat. § 50-13.6
 
 ;
 
 see, e.g.
 
 ;
 
 Danielson v. Cummings
 
 ,
 
 43 N.C. App. 546
 
 , 546,
 
 259 S.E.2d 332
 
 , 332 (1979) ("Plaintiff instituted this action on 15 February 1978 alleging he was injured by the negligence of the defendants in an automobile collision in the city of Greensboro."),
 
 aff'd
 
 ,
 
 300 N.C. 175
 
 ,
 
 265 S.E.2d 161
 
 (1980). Black's Law Dictionary defines the verb "institute" as "to begin or start; commence."
 
 See institute
 
 , Black's Law Dictionary (10th ed. 2014). We simply cannot read the phrase "under the circumstances existing
 
 at the time of the institution
 
 of the action or proceeding[,]"
 
 N.C. Gen. Stat. § 50-13.6
 
 , to refer to a period of time extending from the date of a filing of a pleading to the date of the trial-here, nearly three years, according to Wife. We must consider a particular date of filing-but many motions have been filed in this case.
 

 *630
 
 Since we are now addressing entitlement to an attorney fee award for modification of child support, not contempt, the date of the institution of the action for purposes of determining entitlement to attorney fees under
 
 N.C. Gen. Stat. § 50-13.6
 
 is based upon the filing of Husband's motion to modify child support, not Wife's later motion for contempt.
 
 See generally
 

 N.C. Gen. Stat. § 50-13.6
 
 . Wife has a claim for attorney fees based upon her contempt motions as well, but the standard for that award differs from an award for modification of child support, and the contempt issue must be considered in its own right.
 
 See, e.g.,
 

 Watson
 
 ,
 
 187 N.C. App. at 69
 
 ,
 
 652 S.E.2d at 320
 
 ("It is settled law in North Carolina that ordinarily attorney fees are not recoverable as an item of damages or of costs, absent express statutory authority for fixing and awarding them. Generally, attorney's fees and expert witness fees may not be taxed as costs against a party in a contempt action. However, our courts have ruled that the trial court may award attorney's fees in certain civil contempt actions." (Citations omitted) ).
 

 On child support, there is no finding as to whether Husband was providing "support which is adequate under the circumstances existing
 
 at the time of the institution of the action or proceeding
 
 ."
 
 N.C. Gen. Stat. § 50-13.6
 
 . Wife argues that the essential facts are evident in the trial court's order and there was no conflicting evidence on this point. But the "essential fact" which is evident in the order is that in February 2012, Husband was unemployed on the date he "instituted" the proceeding by filing a motion to modify the child support obligation and he was still paying his full child support obligation. Since he was still paying his full child support obligation "at the time of the institution of the action or proceeding," he did not "refuse" to "provide support which is adequate" at that time.
 
 Id
 
 . He did stop paying the full child support obligation later, but that is not the question under
 
 N.C. Gen. Stat. § 50-13.6
 
 .
 
 Id
 
 .
 

 This is not the end of the analysis, since Wife also filed a motion to modify child support on 13 November 2012. Wife alleged in this motion, upon information and belief, that Husband was already receiving severance pay checks from Company and also requested modifications related to the children's medical insurance coverage. But the trial court found that although Company had tendered checks to Husband, he had refused to accept these payments, since he was pursuing the lawsuit against Company seeking a greater recovery. And, as of November 2012, Husband was continuing to pay the full child support obligation under the existing order, so he was still paying adequate support at the time of institution of Wife's motion to modify child support. Therefore, the attorney fee award under
 
 N.C. Gen. Stat. § 50-13.6
 
 could not be based upon Wife's motion to modify child support either.
 

 *631
 
 The "circumstances existing" as of the dates of institution of both motions for modification of child support differed greatly from those over the following two years and at the time of trial.
 
 Id
 
 . The trial court therefore erred to the extent it awarded attorney fees for the modification of child support based upon
 
 N.C. Gen. Stat. § 50-13.6
 
 , since Husband was still paying his full obligation at the time of institution of both motions to modify child support. For this reason, and because the trial court awarded fees without specifying the basis, we vacate the attorney's fee award.
 

 *232
 
 B. Entitlement to attorney fees on other claims
 

 Husband also argues on the award of attorney fees that there is no way for this court to assess the "reasonableness" of the award on each claim. For example, Husband's child support obligation was increased, but his alimony obligation was decreased. In addition, the required findings for an attorney fee award for modification of alimony and contempt are not identical. We will not address these issues further, since we must vacate the attorney fee award for the reasons already discussed. On remand, the trial court should make the required findings of fact and conclusions of law for the attorney fee award on each component of the award and determine the appropriate amount of fees for each claim.
 

 Conclusion
 

 For the reasons stated above, we affirm in part and reverse in part and remand the trial court's order modifying alimony and child support. Because the trial court's alimony order was supported by its findings regarding depletion of the estates of the parties, we affirm the trial court's modification of alimony, both for the past and for prospective alimony. However, the trial court shall correct the mathematical error in the alimony arrears on remand. The basis for the modification of the child support from the date of Husband's motion to modify until July 2015 is unclear, so we reverse this portion of the order and on remand the trial court must clarify whether it is imputing income to Husband during each time period, the basis for imputation, the amount of income imputed, and how the child support obligation was calculated. The prospective child support order as of July 2015 is affirmed. We also conclude the trial court did not err in finding Husband in civil contempt, but because we have reversed and remanded the child support provisions of the order, we must also reverse and remand the contempt portion of the order so the trial court may enter a new order to address whether Husband is in willful civil contempt in accord with any changes to alimony arrears or child support and child support arrears owed on
 
 *632
 
 remand. Finally, we reverse the order on attorney fees and remand to the trial court for entry of a new order on attorney fees setting forth the amounts of fees awarded for each component of the case, with the findings of fact and conclusions of law needed to support fees awarded for each component of the case.
 

 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 

 Judges DILLON and INMAN concur.
 

 [1]
 

 In some portions of this opinion, we will refer to both the alimony obligation and the child support obligation together as Husband's "support obligation" since the findings of fact generally apply to both obligations. We will differentiate between the two obligations in portions of the opinion where only one obligation is addressed.
 

 [2]
 

 The only information we can find regarding Husband's area of expertise is his testimony that he had worked in "power generation" and in "import-export" and his background was in engineering.
 

 [3]
 

 A two-door convertible is not exactly a car suitable for three children, but Husband was not exercising his visitation with the children.
 

 [4]
 

 Husband organized GA Hill & Associates, LLC, through which he planned to operate "an import/export business with partners in China" in 2012. Husband claimed the business failed and he lost "tens of thousands of dollars." The trial court did not find that Husband had income from this business or from the other business he attempted to start in China, but the trial court also did not find Husband's testimony about these businesses credible.