IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-369

Filed 5 November 2025

Mecklenburg County, No. 17CVD009299-590

PTOLEMY T. ALLPORT, Plaintiff,

v.

SIMON J. ALLPORT, Defendant.

Appeal by defendant from order entered 23 May 2023 by Judge Paige B. McThenia in District Court, Mecklenburg County. Heard in the Court of Appeals 29 January 2025.

> *James, McElroy & Diehl, P.A., by Preston O. Odom, III and G. Russell Kornegay, III, for plaintiff-appellee.*
>
> *Sellers Ayers Dortch & Lyons, PA, by Dorian H. Gunter, for defendant-appellant.*

STROUD, Judge.

Simon J. Allport ("Husband") appeals from an Order Regarding Permanent Alimony ("Alimony Order") directing him to pay $14,767.52 per month to Ptolemy T. Allport ("Wife").

Husband introduced his case on appeal in this manner:

> This case is about a trial judge erroneously concluding that a woman with an estate worth approximately $4 million, who has three degrees and three bar memberships, could not make a substantial contribution to her own support.

> The trial court ignored Wife's available income and ordered Husband to indefinitely fund her artificially inflated lifestyle as punishment for his extramarital affair.

No doubt this is an accurate reflection of Husband's personal feelings about this case, but the courts do not decide cases based on the personal feelings of either party. Trial courts decide cases based on the facts as presented in the evidence and on the law. This Court reviews the trial court's orders based on the appropriate standards of review as applied to the trial court's order and law and evidence in the record.

Husband's introduction overlooks the standards applied by this Court, so with these standards in mind, we will introduce Husband's appeal as follows: This case is about a trial judge carefully considering four days of testimony and voluminous evidence, making determinations of the credibility and weight of all the evidence, preparing an order with over 15 single-spaced pages of detailed findings of fact addressing each fact necessary to determine alimony – none of which are challenged on appeal as unsupported by the evidence – and concluding that Husband can and should pay alimony to Wife. The trial court fully considered the incomes of both parties, their established standard of living during the marriage, and the factors stated in North Carolina General Statute Section 50-16.3A, including Husband's "illicit sexual behavior," a factor which requires an award of alimony if the supporting spouse has the ability to pay and the dependent spouse needs alimony. *See* N.C. Gen. Stat. § 50-16.3A(a) (2023).

## I. Factual and Procedural Background

This summary of the factual background is based on the trial court's unchallenged findings of fact. The parties first met in April 1986 while they both were working as engineers for Shell International in the Middle East and began dating shortly thereafter in June of that year. Husband was dissatisfied with his career as an engineer. Wife encouraged him to apply to medical school and assisted him in completing and submitting his applications. Ultimately, Husband was accepted and began attending Westminster Medical School at the University of London. Wife resigned from her position at Shell and moved with Husband to London in 1987.

While in London, Wife completed a two-year program to obtain a master's degree from the London School of Economics. Wife then enrolled at Tulane University School of Law in Louisiana. The parties got married on 19 October 1989, while Husband was still in medical school and Wife was in law school.

Husband graduated medical school in 1992 and began his internship and residency at the University of Arizona in 1993. Wife moved to Arizona with Husband, passed the Arizona bar exam, and began practicing at a large firm before accepting a job at a district attorney's office to gain trial experience.

In July 1996, Husband accepted a Fellowship in Gastroenterology in Atlanta, Georgia. Wife moved to Georgia with Husband, passed the Georgia bar exam, and began working for a boutique law firm while Husband completed his fellowship. During their time in Georgia, Wife gave birth to the parties' first child in August

1998. Wife returned to full-time employment following her maternity leave. During the years of Husband's medical training in both Arizona and Georgia, Wife was the primary income earner for the family.

After his fellowship, Husband accepted a position at Gastroenterology Associates, PA in Hickory, North Carolina. The parties and their child moved to North Carolina for Husband's new job, and Wife began working for a law firm in Hickory after passing the North Carolina bar exam. In May of 2000, Wife gave birth to the parties' twins and later returned to work at the law firm at a reduced caseload to ensure flexibility to care for their children. In 2009, the parties agreed it would be best for Wife to quit her job at the law firm to become a full-time stay-at-home wife and mother. Wife resumed employment as an assistant district attorney in 2014 but resigned after about nine months because it was "unmanageable[ ]" to support the children and a career due to Husband's demanding work schedule. After leaving the district attorney's office, Wife became inactive from the North Carolina Bar and remained a stay-at-home wife and mother.

After moving to North Carolina, the parties began enjoying a high standard of living due to Husband's income as a physician. During their marriage, the parties acquired several properties and real estate interests throughout North and South Carolina. The parties also drove "luxury" vehicles, owned a boat and jet ski, and "routinely spent over $50,000" annually on vacations.

In fall of 2012, Husband began having a secret romantic affair with a nurse

colleague, Darla. During the time of their affair, Husband and Darla had an intimate sexual relationship, often spending nights together at one of the parties' homes while Wife and the children remained at one of their other homes. This clandestine affair continued for about three years, until September 2015, when Wife discovered text messages between Husband and Darla on Husband's laptop. The parties ultimately separated on 25 September 2015, shortly after Wife discovered this affair.

On 30 May 2017, Wife filed a Complaint and Motion for Interim Distribution in District Court, Mecklenburg County, asserting claims for child custody and child support, postseparation support ("PSS"), alimony, attorney fees, and equitable distribution. After the parties divorced on 9 November 2017, Husband proposed to Darla on 24 December 2017 and they married on 23 June 2018.

On 2 November 2017, a hearing was held before Judge Sean P. Smith. In an order entered 5 February 2018 ("PSS Order"), Judge Smith made findings of fact and conclusions of law addressing PSS, temporary child support, temporary support arrears, attorney fees, and interim equitable distribution. At the time of this hearing, the parties had two minor children: one who remained in the custody of Wife, and the other who remained in the custody of Husband.

In the PSS Order, Judge Smith found Husband's "total gross monthly income from all sources is $65,984.67[,]" and Wife's reasonable monthly expenses were $17,500.00 per month. The estimate of Wife's monthly expenses included both her own individual needs and "shared family expenses[ ]" such as house payments and

utilities, but did not include any costs for childcare.  Expenses for the minor child in Husband's custody were included in his reasonable monthly expenses.  The trial court found Husband had "total monthly expenses of $7,100.89 for himself and [the minor child in his custody], a child support obligation . . . of $3,135.00 [for the minor child in Wife's custody], and a net monthly income of $38,942.94[.]"  Judge Smith ordered Husband to pay Wife $24,788.00 per month in PSS.  This PSS was ordered retroactive to 1 December 2016.

On 16 July 2019, Husband filed a Motion to Modify his PSS obligations.  Husband alleged that "[d]ue to circumstances outside of his control, . . . Husband's income has substantially decreased since the entry of the [PSS] Order."  On 16 August 2019, Wife filed a Motion for Contempt alleging Husband "willfully violated" the PSS Order by paying "only $12,000.00 in [PSS] for the month of August 2019."  Both Wife's Motion for Contempt and Husband's Motion to Modify were heard 6 November 2019.  In an order filed 17 December 2019, the trial court concluded Husband "has had, and continues to have, the ability to comply with the [PSS] Order[,]" and his "failure to comply with the [PSS] Order is willful."  The trial court adjudicated Husband to be "in civil contempt . . . for his failure to comply" with the PSS Order and ordered Husband to pay $51,152.00 in PSS arrearages or face imprisonment.

Regarding Husband's Motion to Modify, in an order ("Modified PSS Order") entered 2 March 2020, the trial court found that "[s]ubsequent to the entry of the [PSS] Order, [ ]Husband's medical practice experienced turmoil and economic

volatility." "Poor management[ ]" of the practice "resulted in a decrease in [ ]Husband's annual income, specifically regarding his quarterly bonus." The court further found "[n]o evidence tend[ing] to suggest that [Husband] acted in bad faith in earning, nor has he made efforts to suppress his income." The court ordered, "[e]ffective . . . [16 July 2019], [ ]Husband shall pay $17,500.00 per month in ongoing [PSS]." Husband did not appeal either the PSS Order or the Modified PSS Order.

As to child custody and child support, the trial court determined this issue to be "moot" as of 16 November 2020 since the youngest child had graduated high school and reached the age of majority. On 25 May 2021, the parties resolved their equitable distribution claim in a Consent Judgment and Order ("Consent Order"). In the Consent Order, the trial court determined the equitable distribution of assets such as property, vehicles, retirement and investment accounts, and business interests. In the Alimony Order, the trial court relied on the Consent Order in finding that "[f]ollowing entry of said [Consent Order], each party has an estate of between two and three million dollars."

The trial court heard Wife's claim for alimony in a four-day trial starting on 13 March 2023. The trial court entered the Alimony Order on 23 May 2023. The trial court ordered Husband to pay Wife $14,767.52 per month in "permanent ongoing alimony[.]" This obligation would continue until the death of either party, or Wife's cohabitation and/or remarriage under North Carolina General Statute Section 50-16.9(b). *See* N.C. Gen. Stat. § 50-16.9(b) (2023). The trial court also determined

Wife's claim for attorney fees would remain "open for hearing at a later date." Husband was served with the Alimony Order on 31 May 2023 and timely filed Notice of Appeal to this Court on 27 June 2023.

## II.    Jurisdiction

Husband's appeal from the Alimony Order is properly before this Court under North Carolina General Statute Section 50-19.1, which provides:

> Notwithstanding any other pending claims filed in the same action, a party may appeal from an order or judgment adjudicating a claim for absolute divorce, divorce from bed and board, the validity of a premarital agreement . . . , child custody, child support, alimony, or equitable distribution if the order or judgment would otherwise be a final order or judgment . . . , but for the other pending claims in the same action.

N.C. Gen. Stat. § 50-19.1 (2023).  The Alimony Order is not a final order as "[ ]Wife's claim for attorney[] fees related to alimony" was an issue "held open for hearing at a later date."  The issue of alimony was adjudicated and decided by the trial court and "would otherwise be a final order" if not for the remaining open issue of attorney fees. *See id.*  This Court has jurisdiction under North Carolina General Statute Section 50-19.1.  *See id.*

## III.    Analysis

Before we address the arguments Husband makes on appeal, we will note those he did not make.  He did not challenge any of the trial court's findings of fact as unsupported by the evidence, so they are all binding on appeal.  *See Mussa v. Palmer-*

*Mussa*, 366 N.C. 185, 191, 731 S.E.2d 404, 409 (2012). Husband did not argue that the findings of fact fail to support the trial court's conclusions of law, although he does present arguments about some conclusions of law. Instead, he argues that the trial court abused its discretion because it should have made different or more findings, that the trial court should have found his evidence more credible than Wife's evidence, and that based on his alternative version of the facts, the trial court should have made different findings and conclusions of law. While we agree that an alternative version of the facts would perhaps lead to different legal conclusions, our standard of review requires that we rely on the unchallenged facts as found by the trial court.

Husband presents two main arguments on appeal regarding the Alimony Order. First, Husband argues the trial court erred in concluding that Wife is a "dependent spouse" for purposes of alimony. Next, Husband argues the trial court "abused its discretion in determining the amount of alimony[,]" and further "abused its discretion in setting the duration of alimony."

## A. Dependent Spouse

Husband first argues the trial court "erred in concluding that Wife is a dependent spouse." Husband contends, in making its dependency determination, the trial court failed to consider all income sources available to Wife and her earning capacity. He also contends Wife's "reasonable needs were grossly inflated." Husband then contends the trial court "impermissibly considered marital misconduct" in

making its dependency determination. Wife argues Husband did not preserve the trial court's dependency determination for this Court's consideration since he admitted to Wife's status as a "dependent spouse" and his own status as a "supporting spouse" in his verified answer to Wife's 30 May 2017 Complaint.

The trial court's determination of whether Wife is entitled to alimony is a question of law we review *de novo*:

> As our statutes outline, alimony is comprised of two separate inquiries. First is a determination of whether a spouse is entitled to alimony. Entitlement to alimony requires that one spouse be a dependent spouse and the other be a supporting spouse. If one is entitled to alimony, the second determination is the amount of alimony to be awarded. We review the first inquiry de novo . . ., and the second under an abuse of discretion standard[.]

*Romulus v. Romulus*, 215 N.C. App. 495, 520-21, 715 S.E.2d 308, 324-25 (2011) (citations, quotation marks, and emphasis omitted).

Husband does not specifically challenge any of the trial court's findings of fact as unsupported by competent evidence. "A trial court's unchallenged findings of fact are 'presumed to be supported by competent evidence and are binding on appeal.'" *Mussa*, 366 N.C. at 191, 731 S.E.2d at 409 (brackets omitted) (quoting *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)).

Under North Carolina General Statute Section 50-16.3A, a party may be entitled to alimony if the trial court determines the party is a "dependent spouse" and "the other spouse is a supporting spouse[.]" N.C. Gen. Stat. § 50-16.3A(a). A

"'[d]ependent spouse' means a spouse, whether husband or wife, who is actually substantially dependent upon the other spouse for his or her maintenance and support or is substantially in need of maintenance and support from the other spouse." N.C. Gen. Stat. § 50-16.1A(2) (2023). Further, a "'[s]upporting spouse' means a spouse, . . . upon whom the other spouse is actually substantially dependent for maintenance and support or from whom such spouse is substantially in need of maintenance and support." N.C. Gen. Stat. § 50-16.1A(5). "A surplus of income over expenses is sufficient in and of itself to warrant a supporting spouse classification." *Barrett v. Barrett*, 140 N.C. App. 369, 373, 536 S.E.2d 642, 645 (2000) (citation omitted).

In her Complaint, Wife alleged that "[she] is the dependent spouse and [ ]Husband is the supporting spouse of the parties' marriage [as] defined by [North Carolina General Statute Section] 50-16.1A (2) and (5), respectively." In his verified answer, Husband admitted to this allegation. And at trial, Husband further testified to these admissions. Specifically, the following interaction occurred when questioned by his attorney:

> Q. Now, [Husband], you would agree that [Wife] was dependent on you for maintenance and support during the course of marriage, wouldn't you?
>
> A. Yes, she was.
>
> Q. Now, looking at [Wife]'s Exhibit 59, that is the summons and complaint that we talked about earlier this morning. Can you turn to Paragraph 18? You see that Page – do you

see Paragraph 18?

A. Yes.

Q. And the allegation is that . . . Wife is [the] dependent spouse and . . . Husband is the supporting spouse of the part[ies'] marriage, as defined by [North Carolina General Statute Section 50-16.1A] (2) and (5), respectively. You see that allegation, correct?

A. I do.

. . . .

Q. Now let's go to your answer and counterclaim and see how you responded to Paragraph[ ] 18 . . . . And that's [Wife]'s Exhibit 60. And look at your response. Your answer to Paragraph 18 is admitted, correct?

A. Correct.

The trial court found "[ ]Husband admitted in [his] pleadings that [ ]Wife was a dependent spouse and that he was the supporting spouse of the parties['] marriage." In addition, Husband did not argue at trial that Wife was not a dependent spouse—his arguments to the trial court, as on appeal, focused on Wife's "unreasonable" and "excessive" expenses, the value of her estate, and that "it's not fair" to say that "he makes a lot of money" and "she shouldn't have to work." But even if we were to ignore Husband's admissions in the pleadings and his failure to make an argument to the trial court that Wife was not a dependent spouse, the trial court also made detailed extensive findings which are binding on this Court about each parties' employment, income, and reasonable monthly needs and expenses, and based on those findings, concluded that "[ ]Wife is actually and substantially dependent upon [ ]Husband" and

further "in need of financial contribution from [ ]Husband to maintain her accustomed standard of living." Husband does not challenge any of these findings made by the trial court as unsupported by the evidence, so these findings are binding on appeal. *See Mussa*, 366 N.C. at 191, 731 S.E.2d at 409. Husband argues mostly about his contentions regarding Wife's potential income sources but the trial court essentially addressed these contentions in Finding of Fact No. 17: "No credible evidence was presented that [ ]Wife has depressed her income in bad faith and there is, therefore, no basis to impute income to [ ]Wife." Even if we were to overlook Husband's admission of Wife's status as a dependent spouse, the unchallenged findings of fact abundantly support the trial court's conclusion that Wife is a dependent spouse.

Husband essentially conceded the issue of Wife's status as a dependent spouse before the trial court in his pleadings and in his arguments to the trial court, and on appeal he makes the same arguments that Wife's expenses are excessive and that she could and should earn an income to support her needs. Husband has not challenged the trial court's findings of fact as to Wife's expenses, income, and estate on appeal, and those findings of fact support the trial court's conclusions as to Wife's dependency status.

## B. Alimony Award

Husband also argues the trial court abused its discretion in determining both the amount and duration of alimony. Regarding amount, Husband specifically contends the trial court "failed to consider all potential sources of income for Wife[,]"

failed to assess and consider Wife's earning capacity, and that Wife's monthly expenses were "artificially inflated[.]" Regarding duration, Husband contends the trial court did not include any specific reasoning as to its determination of alimony duration and failed to consider how the parties' incomes and expenses would change over time. Husband further contends the trial court abused its discretion in determining the duration of alimony because the duration "was intended to punish Husband" for his extramarital affair. We disagree.

We review the trial court's determination of both the amount and duration of alimony for abuse of discretion. *See Collins v. Collins*, 243 N.C. App. 696, 700, 778 S.E.2d 854, 856 (2015). "The trial court's decision constitutes an abuse of discretion where it 'is manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision.'" *Id.* (brackets omitted) (quoting *Frost v. Mazda Motor of Am., Inc.,* 353 N.C. 188, 199, 540 S.E.2d 324, 331 (2000)). The determination of the amount and duration of alimony is "left to the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a manifest abuse of that discretion." *Kelly v. Kelly*, 228 N.C. App. 600, 601, 747 S.E.2d 268, 272 (2013) (citation and quotation marks omitted). North Carolina General Statute Section 50-16.3A specifically directs that a trial court "shall exercise its discretion in determining the amount, duration, and manner of payment of alimony." N.C. Gen. Stat. § 50-16.3A(b).

> [T]he findings of fact required to support the amount,

duration, and manner of payment of an alimony award are sufficient if findings of fact have been made on the ultimate facts at issue in the case and the findings of fact show the trial court properly applied the law in the case. The findings of fact need not set forth the weight given to the factors in section 50-16.3A(b) by the trial court when determining the appropriate amount, duration, and manner of payment, as the weight given the factors is within the sound discretion of the trial court.

*Friend-Novorska v. Novorska*, 143 N.C. App. 387, 395-96, 545 S.E.2d 788, 794 (2001)

(footnote omitted).

North Carolina General Statute Section 50-16.3A(b), entitled "Amount and Duration[,]" requires the trial court to consider certain factors to determine the amount and duration of alimony:

> The court shall exercise its discretion in determining the amount, duration, and manner of payment of alimony. The duration of the award may be for a specified or for an indefinite term. In determining the amount, duration, and manner of payment of alimony, the court shall consider all relevant factors, including:
>
> > (1) The marital misconduct of either of the spouses. Nothing herein shall prevent a court from considering incidents of post date-of-separation marital misconduct as corroborating evidence supporting other evidence that marital misconduct occurred during the marriage and prior to date of separation;
> >
> > (2) The relative earnings and earning capacities of the spouses;
> >
> > (3) The ages and the physical, mental, and emotional conditions of the spouses;
> >
> > (4) The amount and sources of earned and unearned

income of both spouses, including, but not limited to, earnings, dividends, and benefits such as medical, retirement, insurance, social security, or others;

(5) The duration of the marriage;

(6) The contribution by one spouse to the education, training, or increased earning power of the other spouse;

(7) The extent to which the earning power, expenses, or financial obligations of a spouse will be affected by reason of serving as the custodian of a minor child;

(8) The standard of living of the spouses established during the marriage;

(9) The relative education of the spouses and the time necessary to acquire sufficient education or training to enable the spouse seeking alimony to find employment to meet his or her reasonable economic needs;

(10) The relative assets and liabilities of the spouses and the relative debt service requirements of the spouses, including legal obligations of support;

(11) The property brought to the marriage by either spouse;

(12) The contribution of a spouse as homemaker;

(13) The relative needs of the spouses;

(14) The federal, State, and local tax ramifications of the alimony award;

(15) Any other factor relating to the economic circumstances of the parties that the court finds to be just and proper.

(16) The fact that income received by either party

was previously considered by the court in determining the value of a marital or divisible asset in an equitable distribution of the parties' marital or divisible property.

N.C. Gen. Stat. § 50-16.3A(b).

### 1. Amount of Alimony

On appeal, Husband argues "Wife has several sources of income available to her which would have lowered the alimony amount had the trial court properly considered them." Specifically, Husband contends the trial court should have considered: (1) "*all* sources of income available to Wife, including but not limited to her IRA funds, Social Security, and the growth in her investment accounts, pursuant to [North Carolina General Statute Section] 50-16.3A[;]" (2) Wife's "sizable" estate, which Husband contends is larger than found by the trial court; and (3) Wife's potential earning capacity. Husband also contends Wife's reasonable needs, as stated in the trial court's findings of fact, were "grossly inflated."

### a. Wife's Income and Estate

Husband is correct in his assertion that North Carolina General Statute Section 50-16.3A provides that trial courts, in determining alimony, "shall consider all relevant factors, including: . . . [t]he amount and sources of earned and unearned income of both spouses, including, but not limited to, earnings, dividends, and benefits such as medical, retirement, insurance, social security, or others[.]" N.C. Gen. Stat. § 50-16.3A(b)(4). The trial court's Alimony Order includes detailed and

extensive findings addressing all these factors, and he has not challenged any of the findings as unsupported by the evidence. Regarding some aspects of Wife's income Husband addresses on appeal, the trial court made these findings of fact:

> 15. [ ]Wife maintains a Charles Schwab Investment account and earns dividends and interest from this asset. [ ]Wife has a gross monthly income of $1,991.28 in dividend and interest income.
>
> 16. [ ]Husband's expert witness, Mr. Densel Fleming, CFP served an Affidavit on February 27, 2023 and also provided testimony at the trial of this matter.
>
> 17. No credible evidence was presented that [ ]Wife has depressed her income in bad faith and there is, therefore, no basis to impute income to [ ]Wife.
>
> 18. [ ]Wife's gross monthly income for alimony purposes is $1,991.28 per month.
>
> . . . .
>
> 43. The relative earnings and earning capacities of the spouses:
>
>> a. As set forth in detail above, [ ]Wife has a monthly gross income of $1,991.28. Given [ ]Wife's absence from the workforce since 2009 (other than her brief employment as an Assistant District Attorney in 2014), [ ]Wife does not have the ability to become re-employed and to support herself financially.
>
> . . . .
>
> 45. The amount and sources of earned and unearned income of both spouses, including, but not limited to, earnings, dividends, and benefits such as medical, retirement, insurance, social security, or others:
>
>> a. [ ]Wife has passive investment income of

$1,991.28 per month. [ ]Wife does not have any income from employment.

Regarding Husband's income, the trial court found he has "a net monthly income of $30,263.19[.]" This income valuation consists of Husband's salary and wages from his job as a gastroenterologist, bonuses, interest and dividends from his brokerage account, less the amount deducted for federal and state income tax, health insurance, and retirement contributions.

It is uncontested that the $1,991.28 Wife receives each month is from a brokerage account and was properly considered by the trial court as passive income. Husband, however, argues the trial court should have also considered potential income from Wife's IRA, which he contends "had a cash flow of approximately $2,451.33 per month," along with $1,316.00 per month Wife could receive in Social Security if she elected for early retirement.[1]

> i.    *Failure to require early IRA withdrawals*

Husband's argument regarding the alleged $2,451.33 per month Wife could theoretically receive from her IRA is based upon an estimate by Husband's financial expert witness, Densel Fleming. Mr. Fleming's evidence regarding Wife's potential early IRA withdrawals was presented to support Husband's contention that the trial

---

[1] At the time this case was called for trial on 13 March 2023, and subsequent entry of the Alimony Order on 23 May 2023, Wife was 63 years old. Wife is not eligible to receive the full amount of her potential Social Security benefits until she is 67 years old.

court should include these amounts in Wife's income.[2]  In estimating this amount, Mr. Fleming ran a "Monte Carlo" simulation, assuming a 5.08 percent rate of return on the total value of Wife's IRA as of 31 December 2022.  Husband also argues that "[a]t Wife's age, there is no penalty for her to withdraw from her IRA."

We first note that the trial court specifically found in Finding No. 16 that Mr. Fleming had presented an affidavit and testimony during the trial.  The next finding, No. 17, states "no credible evidence was presented that [ ]Wife has depressed her income in bad faith and there is, therefore, no basis to impute income to Wife."  Mr. Fleming's evidence focused on Wife's potential income and Husband used this evidence to argue that the trial court should essentially impute the income to her, as it was undisputed that Wife had never received any early IRA withdrawals.

It is well-established that for purposes of alimony, the trial court should consider each party's actual income "at the time of the order" unless there is evidence of bad faith depression of income:

> Alimony is ordinarily determined by a party's actual income, from all sources, at the time of the order. To base an alimony obligation on earning capacity rather than actual income, the trial court must first find that the party has depressed her income in bad faith. In the context of alimony, bad faith means that the spouse is not living up to income potential in order to avoid or frustrate the support obligation. Bad faith for the dependent spouse means shirking the duty of self-support[.]

---

[2] Our dissenting colleague accepts Mr. Fleming's projection of potential income as fact, but the trial court did not make this finding, although it did consider Mr. Fleming's evidence.

*Works v. Works*, 217 N.C. App. 345, 347, 719 S.E.2d 218, 219 (2011) (citations, quotation marks, and emphasis omitted).

The trial court found Wife was not acting in bad faith by continuing her usual practice of not taking early withdrawals from her IRA. Early withdrawals would require Wife to deplete her estate to meet her current expenses and would prevent her from being able to continue to save for retirement in a tax-advantaged account.

In support of Husband's argument the trial court should have imputed income to Wife, based upon Mr. Fleming's hypothetical projections of what Wife might be able to withdraw from her IRA and his assumptions of the future performance of the assets in her IRA, Husband cites to this Court's opinion in *Phillips v. Phillips*, 185 N.C. App. 238, 647 S.E.2d 481 (2007). In *Phillips*, this Court vacated and remanded an alimony order because the lack of findings left the Court unsure of whether the trial court considered the plaintiff's "medical benefits" or income from her IRA, where the evidence showed that the plaintiff was receiving IRA income:

> With regard to [the] defendant's contention that the trial court erred in failing to make findings regarding [the] plaintiff's health insurance benefits, we agree. [North Carolina General Statute Section] 50-16.3A(b)(4) requires the court to consider the amount and sources of both spouses' income including benefits such as medical, retirement, insurance, social security or others. The court made no findings with respect to [the] plaintiff's medical benefits or potential income from her IRA, *although evidence of the sources of income was presented at the hearing.* Without such findings, we cannot be sure that the trial judge properly considered the factor. Therefore, we vacate the award of alimony and remand for additional

> findings on all income, including medical benefits and any
> other benefits that function as income, of which evidence
> was presented at the hearing.

185 N.C. App. at 243, 647 S.E.2d at 485 (emphasis added) (citations, quotation marks, brackets, and ellipses omitted). But here, unlike *Phillips*, we can be sure that the trial court properly considered this evidence, because the detailed and well-organized Order addresses it. Here, there was no evidence that Wife was actually receiving any income from her IRA and the trial court clearly considered and rejected Husband's evidence that Wife should be required to begin taking early IRA withdrawals. At trial, the evidence showed Wife had continued to reinvest the interest and dividends from her IRA, intending to live off the accrued value when she reaches retirement age and she has never relied on distributions from the IRA as a source of income. The trial court's findings also indicate that requiring her to take early IRA distributions would require Wife "to deplete her estate to meet her reasonable needs and expenses."

A financial expert for Wife, Victoria Coble, who estimated Wife's passive income to be $1,991.28, testified about why the interest and dividends from Wife's IRA were not included in her income determinations. Specifically, she testified as follows:

> Q. Did you do any analysis of how much income and capital
> gains and so forth, appreciation, she could expect to get on
> a monthly or yearly basis from her Charles Schwab
> investment account and from Charles Schwab?
>
> A. So we pulled and we included in the written affidavit
> and on her financial affidavit, all of the interest, dividends,

and capital gain distributions. So for 2022, all of that would have been disclosed.

Q. But it didn't include interest and capital gains and dividends accumulated in her individual retirement account, did it?

A. It did not. She's not taking any money out of the IRA right now, so it did not.

Q. Well, you didn't reflect any income in that account in her IRA account because I guess . . . she didn't -- this is not taxable or it's not on the tax return as long as it's not taken out. Is that correct?

A. Well, I didn't pick it up. She's not 72, so she's not taking the distributions out of the IRA. So all those things kind of stay in the IRA, where the investment account is just an investment account. It's not locked up under the --

Q. But there's income being made in it.

A. For sure. Yes.

Q. And there's -- her net estate is increasing because of the dividends and interest and appreciation and capital gains that are accruing within that account, aren't they?

. . . .

A. If the IRA is invested in the market. So the market goes up, it goes up. If the market goes down, it goes down. I can't tell you off the top of my head. I would guess it does have interest and dividend income as well. But you're right that it will follow the market.

Further, Ms. Coble also noted that Mr. Fleming's estimate of $2,451.33 per month from Wife's IRA was only hypothetical, stating:

Again, we didn't consider whether or not [her investment returns were] actually being retrieved or being claimed. We

- 23 -

> just looked at access to those and then made that
> adjustment to the current need amount as this is income
> that is being -- that we know that has -- that's accessible
> today[.]

Husband's expert witness, Mr. Fleming, presented evidence of estimates of Wife's

potential income based on hypothetical projections of what Wife might be able to

withdraw from her IRA based on his assumptions of the future performance of the

assets in her IRA, but the evidence showed Wife had never received any distributions

from her IRA, only reinvesting interest and dividends for her future retirement. And

the trial court's unchallenged findings indicate that during their marriage, the

parties had established a practice of making "significant retirement savings

contributions each year, budgeting a sizable portion of their income to savings. The

parties had an established category of expense called 'savings' and budgeted for this

expense every month. Their historical custom of savings was an important part of

their accustomed standard of living."

The trial court's findings also address Husband's own substantial

contributions to his 401(k) account, both during the marriage and after, and

considered his 401(k) contributions as a reasonable deduction from his gross income.

As Wife correctly notes, Husband did not "fault the trial court for excluding dividends

and interest derived from his retirement accounts in calculating his net monthly

income for alimony purposes. Such incongruity is telling." The trial court treated

both parties the same in this regard. The trial court considered Husband's own 401(k)

contributions as proper deductions from his gross income, and the trial court did not require Husband to reduce his contributions to his 401(k) to enable him to pay more alimony to Wife. Likewise, the trial court did not abuse its discretion by allowing Wife to allow her IRA to continue to grow instead of requiring her to deplete her estate by beginning to take distributions from the account, and the trial court did not abuse its discretion by not treating potential income from Wife's IRA account as income under Section 50-16.3A(b)(4).

Apparently based on *Bryant v. Bryant*, 139 N.C. App. 615, 534 S.E.2d 230 (2000),[3] our dissenting colleague accepts Husband's argument that the trial court erred by not imputing income to Wife based on the potential for early withdrawals from her IRA for purposes of determining her need for alimony. However, the dissent would apparently allow Husband to continue to benefit from a reduction of his net income by making his own contributions to his 401(k) plan and reinvestment of any income in the plan. The "logical" error in *Bryant* was that the trial court treated the spouses differently for purposes of determining their incomes and expenses, *id.* at 619, 534 S.E.2d at 233; here the trial court treated both parties the same, although Husband's retirement contributions are done through his 401(k) plan and Wife's are done through her IRA, and these two types of plans work differently.

---

[3] Husband did not present any argument based on *Bryant*, nor did his brief cite this case, perhaps because the trial court treated both parties the same; it did not treat the retirement investments of the parties differently, as did the trial court in *Bryant*. *See* 139 N.C. App. at 619, 534 S.E.2d at 233.

In *Bryant*, an equitable distribution judgment had previously divided "the parties' investment accounts, which they established during the course of the marriage to provide funds for their retirement[.]" *Id.* at 616, 534 S.E.2d at 231. "It was the practice of the parties during the marriage to reinvest all dividends and interest earned on these investment accounts." *Id.* The accounts were equally divided, and each party was "receiving an identical amount of investment income from them, averaging $1981.75 per month in 1997." *Id.* In the alimony order, for the plaintiff-wife, the trial court included $1,981.75 per month as monthly investment income and included the same amount as one of her expenses, to "enable the plaintiff to continue to reinvest fully the investment income." *Id.* (internal quotation marks and brackets omitted). But for the defendant-husband, the trial court included the $1,981.75 investment income as part of his income and did not treat this as an expense for him. *Id.* On appeal, the defendant-husband argued that the trial court should not have considered the investment amount as one of plaintiff-wife's expenses. *Id.* at 617, 534 S.E.2d at 231. This Court noted that "given that the trial court's calculation of an alimony award necessarily involves a comparison of the income and expenses of both spouses . . . , in order to provide adequate review of the court's alimony award, we must necessarily review the trial court's calculations as they relate to both spouses." *Id.* (citation and emphasis omitted).

Here, the trial court made detailed findings of fact regarding the income, expenses, and retirement contributions made by both parties, including Wife's

expense of "[r]etirement savings" and Husband's deductions from his gross income for 401(k) plan contributions as well as "401(k) [p]lan [c]atch [u]p" contributions. The trial court's findings regarding Husband's income includes a table listing thirteen "[d]eductions" from his monthly gross income, including taxes, several types of insurance, and his 401(k) contributions. Since Husband is still employed and contributing to his 401(k) plan, the findings do not treat his 401(k) deductions as an "expense" but as a deduction from his gross income. These deductions from his gross income allow Husband to continue contributing to his estate, increasing its value while also reducing his taxable income. Ultimately, the trial court found Husband had monthly deductions of $26,761.28 from his gross monthly income of $57,024.47, for a "net monthly income of $30,263.19 for alimony purposes."

Wife was not employed and did not have a 401(k) plan; she had an IRA. The IRA was part of Wife's *estate*. The trial court found that each party "has an estate of between two and three million dollars." The trial court's Consent Order entered 25 May 2021 determined equitable distribution of assets, but did not set out detailed findings on the assets included in the marital estate or distributed to each party. However, the evidence at trial showed that Wife' estate included a "Schwab IRA rollover account" and when the parties separated, Wife's IRA was valued at about $205,000. By May of 2021, the value of her IRA had increased to $388,358.84. All the appreciation in the IRA came from growth within the account. Because it was an IRA, Wife would only be able to make contributions from earned income, and Wife

had no earned income, so the only way she could continue to have appreciation in her IRA was from appreciation of the assets in the account or reinvestment of any earnings. Based on this evidence, in part, the trial court made an ultimate finding that "[a]bsent an award of alimony, [ ]Wife would have to deplete her estate to meet her reasonable needs and expenses."

Husband's argument, and our dissenting colleague, conflate the concepts of current income and depletion (or avoiding depletion) of Wife's estate. Husband has earned *income* from employment and can continue to contribute to his 401(k) plan as he did during the marriage; Wife does not have earned income and cannot contribute to her IRA from her earned income. Husband contributes to his retirement savings and increases his estate by contributions to his 401(k) plan and these contributions are deductions from his gross income. Alimony helps Wife to avoid *depletion* of her estate by premature withdrawals from her IRA and allows her IRA to continue to increase in value – assuming her investments do well – until she reaches full retirement age.

The IRA plan is part of Wife's estate, which is not to be depleted for her current support since Husband had adequate ability to pay alimony to meet her needs. The trial court found Husband had a monthly surplus of $24,642.21 left after deductions and his own reasonable expenses. The IRA will be a source of income for Wife in the future, when she begins to take distributions from the plan, but at this time, it is an investment which is part of her estate, not income. Husband's argument was that

Wife should be required to deplete her estate to convert the IRA from an asset to current income to fund her current needs, even though she had never taken any contributions from the IRA. Or the trial court would have to impute income to Wife based on potential early withdrawals from the IRA to include this as part of her income for purposes of alimony, but the trial court found no bad faith to support imputing income. *See Works*, 217 N.C. App. at 347, 719 S.E.2d at 219.

Our dissenting colleague views the evidence as showing that Wife already has the income to substantially fund her reasonable expense of investing in her IRA and that under the trial court's Order her retirement is being funded by about $5,000 per month, including the $2,451.33 she could hypothetically withdraw from her IRA (based on Mr. Fleming's estimate) and the $2,500 Wife listed as an "expense" for retirement savings. But based on the trial court's findings of fact, this is not correct. This approach would require either imputing income to Wife of $2,451.33 based on Mr. Fleming's estimate or ordering depletion of Wife's estate to fund her current expenses. Contrary to the dissent's assumption that Wife has IRA income in this specific amount, Wife does *not* have a current *income* of $2,451.33 from any source to invest in her IRA. The evidence showed and the trial court found Wife had not received any distributions from her IRA. The amount of $2,451.33 was Mr. Fleming's projection of what Wife might be able to withdraw from the IRA—and if she began withdrawing this amount from the IRA, this would be a change to the long-established practice of re-investing any income in the IRA for her retirement. She

would be depleting her retirement assets in her IRA to fund her current living expenses. Thus, the effect of our dissenting colleague's proposal would be to require the trial court to impute income of $2,451.33 to Wife, despite the fact that the trial court did not find Mr. Fleming's projections to be credible. Requiring Wife to stop reinvestment in her IRA would also be contrary to the parties' established practice of retirement savings as found by the trial court.

The trial court's findings regarding the established practices of retirement savings during the marriage, and the findings of the expenses and net incomes of both parties were consistent with their practices during the marriage. In *Bryant*, the "more difficult issue" was

> the effect of the trial court's characterization of investment income as an expense in this case. Given the distinction between the marital standard of living and reasonable expenses in setting alimony awards, the *Glass* Court's holding relating to the standard of living leaves open the question of whether the trial court below properly characterized investment income as an expense in this case. *See also Rhew v. Rhew*, 138 N.C. App. 467, 531 S.E.2d 471 (2000) (holding that, in determining entitlement to alimony, as opposed to the amount of alimony, trial court erred in disregarding evidence pertaining to the established pattern of savings in considering defendant's accustomed standard of living).

139 N.C. App. at 618, 534 S.E.2d at 232 (emphasis omitted) (citing *Glass v. Glass*, 131 N.C. App. 784, 509 S.E.2d 236 (1998)). This Court held that the trial court did not abuse its "discretion by characterizing the funds reflecting a marital pattern of savings as a reasonable expense in this case" because "[the] defendant is still

employed and has a comfortable and significantly higher income than [the] plaintiff, who is not working." *Id.* at 619, 534 S.E.2d at 232-33. But this Court did find an abuse of discretion from "the trial court's inclusion of this investment income amount *as an expense for the plaintiff but not for the defendant.*" *Id.* at 619, 534 S.E.2d at 233 (emphasis added). This Court stated that

> [i]t is not logical that the trial court could properly characterize this investment income, earned and reinvested during the course of the marriage, as an expense for one spouse but not for the other. The court's calculation in this respect effectively promotes the manipulation of funds to affect the support obligation, which this Court has often sought to prevent.

*Id.* (citations omitted). Ultimately, this Court in *Bryant* held that the trial court would logically have to include the investment income amount as an expense for the defendant-husband since it was treated as an expense for the plaintiff-wife and remanded for entry of new findings of fact with regard to reasonable expenses of both parties. *See id.*

Here, the trial court allowed both parties to continue their marital practice of investing in or, for Wife, not depleting their retirement accounts. In *Bryant*, the parties each had identical investment accounts, since one account had been divided and each received half. *See id.* at 616, 534 S.E.2d at 231. Under those facts, treating the very same earnings from the account differently for each party was the "manipulation of funds to affect the support obligation" this Court disapproved. *Id.* at 619, 534 S.E.2d at 233. But here, the parties did not have identical investment

accounts. Husband was saving for his retirement using deductions from his current income into his 401(k) plan, while Wife had no earned income and was maintaining her funds in her IRA. During the marriage, they had established these methods and patterns of retirement savings. The trial court did not treat their investments differently, nor did it characterize either party's investments improperly, as happened in *Bryant, see id.* at 619, 534 S.E.2d at 232-33, but it made findings addressing the income and retirement contributions of each party.

If we were to remand for the trial court to include Wife's potential income from early IRA distributions, this would effectively require the trial court to impute income to Wife for purposes of calculating her need for alimony, but the trial court found that there was no credible evidence to support imputing income to Wife. And based on this Court's logic in *Bryant*, if we were to remand, we would also have to require the trial court to make new findings as to Husband's income by reconsidering whether Husband should be permitted to reduce his net income and ability to pay alimony by the amount of his 401(k) contributions or whether any earnings within his 401(k) plan should be treated as income. *See id.* at 619, 534 S.E.2d at 233. This change would increase his income for purposes of his ability to pay alimony as well. This result is not supported by any legal authority, and Husband has not demonstrated any abuse of discretion in the trial court's treatment of Wife's IRA as part of her estate and not current income.

      *ii.    Failure to require Wife to elect early Social Security benefits*

Husband also argues the trial court should have considered the $1,316.00 a month Wife could receive from Social Security benefits if she elected for early retirement before the age of 67. Husband contends that if Wife is not going to be required to work to support herself, she should at least be required to begin to draw upon her retirement benefits, including Social Security. His argument regarding Social Security is similar to his argument regarding imputation of income based on potential early withdrawals from Wife's IRA. Again, his argument would require imputing income to Wife. Wife counters that the trial court

> made findings sufficient to show it considered—but ultimately rejected—including any as-yet-unelected social security benefits or undistributed IRA-derived funds as potential income to Wife. Specifically, the trial court did so via Findings of Fact 15, 17-18, 43a, 45a, and 49a, . . . which collectively determine that counting anything other than the $1,991.28 amount from Wife's brokerage account as income to her would require her "to deplete her estate to meet her reasonable needs and expenses."

Wife is correct; the trial court considered but rejected Husband's evidence and his contention that she should be required to elect to receive early Social Security benefits.

Wife notes that her expert witness, Ms. Coble, determined "that if Wife elected to take early retirement social security benefits at age 62 and reached the life expectancy Fleming projected (age 82), she would lose approximately $40,000.00 per year from then on." Husband's expert witness, Mr. Fleming, acknowledged that Wife would receive "an increased amount of $1,464 per month[ ]" if she elects to withdraw

her Social Security benefits "at her full retirement age of 66 years and 10 months[.]"

Our dissenting colleague would remand for the trial court to make additional findings on whether to impute income to Wife based on her potential early Social Security benefits based on the view that the trial court's finding of "no credible evidence" that Wife had depressed her income in bad faith "in context" was referring to Wife's choice not to seek a new job at 63 years of age. We disagree, since that finding in the context of the Order is in the section entitled "[ ]Wife's Employment and Income" *and* the finding immediately follows Finding No. 16 regarding Husband's expert witness, Mr. Fleming, who presented expert testimony and evidence as a certified financial planner about Wife's investment income and potential social security benefits. He did not present evidence about Wife's failure to obtain new employment. In addition, the Order includes detailed findings about Wife's employment history and earning capacity in Findings No. 43, 44, 45, 47, and 48 which address the alimony factors under North Carolina General Statute Section 50-16.3A(b).

The dissent also notes that there is no specific finding addressing Wife's eligibility to elect early Social Security benefits. But in Findings No. 41 and 43,[4] the trial court made "specific findings as to each factor set forth in [North Carolina General Statute Section] 50-16.3A(b) upon which evidence was presented at trial:"

---

[4] Finding No. 41 serves as an introduction to numbered findings addressing each statutory factor and applies equally to Findings No. 42 through 52.

45. The amount and sources of earned and unearned income of both spouses, including, but not limited to, earnings, dividends, and benefits such as medical, retirement, insurance, *social security*, or others:

> a. [ ]Wife has passive investment income of $1,991.28 per month.[5] [ ]Wife does not have any income from employment.

(Emphasis added.)

It is well established that the trial court need not make a finding about every fact shown by the evidence presented as long as the findings support the trial court's conclusions. *See Medlin v. Medlin*, 64 N.C. App. 600, 603, 307 S.E.2d 591, 593 (1983) ("The court is not required to find all facts supported by the evidence, but only sufficient material facts to support the judgment." (citations omitted)). Here, that evidence was voluminous – the record is 1471 pages, there are 789 pages of transcript from the hearing, and 7,566 pages of record supplement of documentary exhibits. The trial court also made many findings of fact we have not quoted here addressing the parties' financial situation. The trial court specifically noted Husband's evidence urging the trial court to include Wife's potential income based upon electing to receive early Social Security benefits by noting Mr. Fleming's testimony and affidavit so it is clear the trial court considered this evidence.

We have been unable to find any legal authority to require the trial court to

---

5 Findings 13 through 18 also address Wife's income and Finding 15 addresses her income of $1,991.28 from dividends and interest from her Charles Schwab Investment Account.

consider imputing income to a spouse based on eligibility to elect *early* Social Security benefits or limiting the trial court's discretion in how to address the potential income from early Social Security benefits. The trial court had the discretion to accept Husband's evidence on Wife's potential Social Security benefits as credible and to make findings based on that evidence, but it also had the discretion not to. Thus, contrary to our dissenting colleague's suggestion, the trial court's Order does demonstrate that it considered Wife's potential to elect early Social Security benefits because it specifically noted Mr. Fleming's evidence. As noted above, the trial court noted its consideration of Mr. Fleming's affidavit and testimony and then found that "no credible evidence was presented" to support imputing income to Wife.

Mr. Fleming was an expert witness for Husband who presented extensive testimony regarding his analysis of

> the income factors, all of the factors that affected [Wife]'s -- the income. It was also to determine -- to evaluate those income levels and the amounts and document them over the time period by which they would occur, and also identify if there were any current or future income that would impact the scenario, as well as how sustainable those income levels were, based upon the sources that they would be coming from, and compare those also, to the statutory mortality, as well.

Mr. Fleming's testimony and documentary exhibits are the primary source of Husband's argument regarding Wife's potential income from her IRAs and from early election of Social Security. The trial court evaluated that evidence and determined that there was "no credible evidence" to support imputing income to Wife. *See*

*Watkins v. Watkins*, 228 N.C. App. 548, 558, 746 S.E.2d 394, 400-01 (2013) ("[T]he trial court is the judge of the credibility of the witnesses who testify and . . . the trial court determines what weight shall be given to the testimony and the reasonable inferences to be drawn therefrom." (citation and quotation marks omitted)). Here, we need not speculate as to whether the trial court considered Husband's evidence about Wife's potential Social Security benefits or what weight it had. This Court has no authority to reassess the credibility or weight of the evidence. And as noted below, in the future, either party may file a motion to modify alimony, as the trial court is not required or expected to predict either parties' changes in income or expenses as they get older, retire, and begin receiving Social Security benefits or other retirement income.

Husband has failed to demonstrate any abuse of discretion by the trial court's rejection of his argument that Wife should be required to elect a reduced amount of Social Security benefits to support her own financial needs, even though he is fully capable of providing support for her by paying alimony while still contributing to his own retirement accounts. The trial court found that "[n]o credible evidence was presented that [ ]Wife has depressed her income in bad faith and there is, therefore, no basis to impute income to [ ]Wife."

### iii. *Valuation of Wife's estate*

Husband argues that "Wife actually has an estate worth approximately $4 million, including cash assets of approximately $3 million[,]" and he contends that

this alleged greater value of Wife's estate should decrease Husband's alimony obligations.

As noted by our Supreme Court in *Williams v. Williams*, estate valuations serve merely as a single guidepost for trial courts to determine each party's earning capacity, ensuring a fair alimony award:

> If the spouse seeking alimony is denied alimony because he or she has an estate which can be spent away to maintain his or her standard of living, that spouse may soon have no earnings or earning capacity and therefore no way to maintain *any* standard of living.
>
> We think, therefore, that the trial court consideration of the "estates" of the parties is intended primarily for the purpose of providing it with another guide in evaluating the earnings and earning capacity of the parties, and not for the purpose of determining capability of self-support through estate depletion.

299 N.C. 174, 184, 261 S.E.2d 849, 856 (1980) (emphasis in original).

Here, regarding the parties' estates, the trial court found that "each party has an estate of between two and three million dollars. Absent an award of alimony, [ ]Wife would have to deplete her estate to meet her reasonable needs and expenses." But again, Husband does not argue, nor could he, that the trial court's finding about potential depletion of Wife's estate is not supported by the evidence. The trial court based its finding regarding the value of Wife's estate on the 25 May 2021 Consent Order regarding equitable distribution. In the Alimony Order, the trial court noted the entry of this Consent Order and found that "following entry of said [Consent

Order], each party has an estate of between two and three million dollars. Absent an award of alimony, [ ]Wife would have to deplete her estate to meet her reasonable needs and expenses." The only evidence cited by Husband in support of his contention that Wife's estate value should be higher is Wife's deposition taken on 11 January 2022. During questions about her estimated net worth, Wife was asked if adding the total value of her assets "would be in excess of three million dollars[?]" Wife responded in the affirmative. However, to the contrary, competent evidence was presented to support the trial court's finding as to Wife having an estimated net worth of around $3 million, such as the value of her homes, vehicle, brokerage account, and IRA, less the value of her debts, including mortgages.

The primary goal of ensuring fairness in alimony awards was emphasized by this Court in *Hill v. Hill*, which noted that

> [a]lthough some cases from our Supreme Court
>
>> appear to disfavor alimony awards that result in estate depletion for one party or the other, those decisions by no means prohibit such awards. Rather, all of these cases cite fairness and justice to all parties as the principle to which an alimony award must conform. Thus, we consider whether the court's award in the present case is fair to all of the parties.

261 N.C. App. 600, 619-20, 821 S.E.2d 210, 225 (2018) (citations and quotation marks omitted). Under this standard of fairness, the trial court did not abuse its discretion in considering the value of Wife's estate and by not requiring Wife to deplete her estate to support her reasonable needs.

b. *Wife's reasonable needs*

On appeal, Husband argues "Wife's monthly expenses, as found by the trial court, were artificially inflated and not 'reasonable' considering the parties' marital standard of living." Specifically, he argues that the trial court abused its discretion in finding that "Wife's expenses . . . are not extravagant and are within the means and lifestyle [ ]Husband's income provided." He argues "the trial court . . . found [his] reasonable monthly expenses to be $5,638.98[,]" contending that "[t]his immense discrepancy in standards of living showcases Wife's egregious spendthrift nature, even considering Husband's income and the parties' marital standard of living." We disagree.

In determining alimony, "the trial court can accept or reject the alleged expenses on any financial affidavit, based upon its evaluation of the credibility of the evidence and the reasonableness of the expenses alleged." *Rea v. Rea*, 262 N.C. App. 421, 426, 822 S.E.2d 426, 431 (2018) (citation omitted). At trial, Wife presented a financial affidavit prepared by her financial expert, Ms. Coble, estimating her total monthly expenses to be $24,042.06. The trial court did not fully accept Wife's estimates and instead found her reasonable total monthly expenses to be $16,758.80 per month, about 30% less than what Wife alleged in her financial affidavit.

Husband's argument mostly addresses his contentions regarding Wife's expenses and findings the trial court could have made instead of those it did make. But Husband does not challenge the trial court's findings as to Wife's current

reasonable expenses or as to the parties' lifestyle during the marriage as unsupported by the evidence, so they are binding on appeal. The trial court made extensive and detailed findings of fact about the parties' accustomed standard of living established during the marriage. For example, the trial court found:

> m. The parties established a very high standard of living during the course of their marriage.
>
> n. At the time of their separation, the parties owned a 5,420 square foot mountain home in Boone, NC . . ., a 7,082 [square foot] lake-front primary residence in Hickory, NC . . ., and a lake lot held as an investment[.] During their marriage, the parties also owned a residence located at . . . Blowing Rock, NC and an interest in a beach home located at . . . Fripp Island, SC, although both of these properties were sold just prior to the parties' separation.
>
> o. Throughout the marriage the parties drove luxury vehicles, including cars manufactured by Porsche, BMW, Mercedes, and the like. The parties also owned . . . a Cobalt 252 boat and a Yamaha jet ski.
>
> p. During the marriage, the parties took frequent vacations, including sailing trips in the Bahamas, Bermuda, Aruba, Grenada, Turks and Caicos, and various other islands; skiing trips to Snowmass, CO and Vancouver, Canada; international trips to Europe and Africa; and domestic travel to New York, NY, Charlottesville, VA, and the like. The family routinely spent over $50,000 in vacations each year.
>
> q. The family held memberships at Lake Hickory Country Club, Yonahlossee Racquet Club, and Spa Athletic Club. [ ]Wife worked out with a personal trainer as frequently as five times per week.
>
> r. The parties employed an *au pair* to assist with childcare, cooking, and cleaning.

s. The parties made significant retirement savings contributions each year, budgeting a sizable portion of their income to savings. The parties had an established category of expense called "savings" and budgeted for this expense every month. Their historical custom of savings was an important part of their accustomed standard of living.

. . . .

u. [ ]Wife is entitled to continue living as the wife of a wealthy man, which she would have otherwise done but for [ ]Husband's illicit sexual affair and the resulting separation and divorce [of the parties].

v. The parties' high standard of living was made possible from the income earned by [ ]Husband.

Our Supreme Court in *Williams* noted:

We think usage of the term "accustomed standard of living of the parties" completes the contemplated legislative meaning of "maintenance and support." The latter phrase clearly means more than a level of mere economic survival. Plainly, in our view, it contemplates the economic standard established by the marital partnership for the family unit during the years the marital contract was intact. *It anticipates that alimony, to the extent it can possibly do so, shall sustain that standard of living for the dependent spouse to which the parties together became accustomed.* For us to hold otherwise would be to completely ignore the plain language of G.S. 50-16.5 and the need to construe our alimony statutes *in pari materia.* This we are unwilling to do.

299 N.C. at 181, 261 S.E.2d at 855 (emphasis added). A prevailing purpose of an alimony award is to support the dependent spouse, allowing her the opportunity to enjoy the "accustomed standard of living" the parties enjoyed during their marriage. *Id.* In light of our Supreme Court's holding in *Williams*, this Court in *Rea* further

explained that

> [f]or some families, the economic standard, and lifestyle
> established during the marriage includes expenses for golf,
> vacations, boats, hobbies, and entertainment, and these
> types of expenses can be included as part of the reasonable
> expenses for purposes of alimony. For example, in *Rhew*,
> this Court determined the trial court properly considered
> evidence of the parties' standard of living during the
> marriage, which included frequent travel and major
> vacations to Canada, New Orleans, Hawaii and Cancun; a
> boat they used regularly; contributions to their church;
> playing golf; arts, crafts and making jewelry; going out
> every Friday evening; going dancing and to movies; going
> out to lunch every Sunday; entertaining friends in their
> home; and engaging the services of a housekeeper. Here,
> instead of pursuing expensive leisure activities, [the
> h]usband and [the w]ife established a lifestyle of caring for
> foster children; this economic choice is certainly worth at
> least the same consideration as golf and vacations. The
> trial court did not abuse its discretion by including these
> expenses in [the w]ife's needs.

262 N.C. App. at 428-29, 822 S.E.2d at 432 (quotation marks and brackets omitted)

(citing *Rhew v. Felton*, 178 N.C. App. 475, 484, 631 S.E.2d 859, 865-66 (2006)).

Here, the trial court made detailed findings as to the extravagant lifestyle the

parties enjoyed during their marriage, and these findings were supported by the

evidence. And the parties enjoyed this lifestyle without incurring excessive debt;

Husband's income was sufficient to provide this lifestyle. It is not relevant that

Husband's reasonable monthly expenses are now less than Wife's. What matters is

the trial court's unchallenged findings regarding the established lifestyle of the

parties during their marriage and Wife's current reasonable needs. Wife was able to

enjoy this lifestyle during the marriage thanks to Husband's substantial income and is entitled to continue this lifestyle following the dissolution of their marriage, at least to the extent Husband has the ability to support it. The trial court did not abuse its discretion in determining Wife's reasonable monthly expenses based upon the lifestyle both parties enjoyed during the marriage. Husband's argument regarding Wife's expenses being "grossly inflated" is overruled.

    *c. Wife's Earning Capacity*

Finally, regarding the alimony amount, Husband argues "[t]he trial court failed to assess Wife's earning capacity." Specifically, Husband contends Wife "has a bachelor's degree . . ., a masters in economics, . . . a law degree[,] . . . passed the bar on the first attempt in three states[,]" and has voluntarily remained unemployed since 2014 "and has instead chosen to travel the world, never once submitting an application for work." Further, Husband argues that because Wife holds several advanced degrees and was the "primary breadwinner" during the early years of the parties' marriage, income should have been imputed to Wife contending she should be required to find at least *some* form of employment. We disagree.

"Ordinarily, alimony is determined by a party's actual income at the time of the alimony order. It is well established that a trial court may consider a party's earning capacity *only if the trial court finds the party acted in bad faith.*" *Megremis v. Megremis*, 179 N.C. App. 174, 182, 633 S.E.2d 117, 123 (2006) (emphasis added) (citations omitted). "In the context of alimony, bad faith means that the spouse is not

living up to income potential in order to avoid or frustrate the support obligation. Bad faith for the dependent spouse means shirking the duty of self-support[.]" *Works*, 217 N.C. App. at 347, 719 S.E.2d at 219 (citation and quotation marks omitted).

> However, evidence of a voluntary reduction in income is insufficient, without more, to support a finding of deliberate income depression or bad faith.
>
> Bad faith may be found from evidence that a spouse has refused to seek or to accept gainful employment; willfully refused to secure or take a job; deliberately not applied himself or herself to a business or employment; or intentionally depressed income to an artificial low.

*Walton v. Walton*, 263 N.C. App. 380, 386-87, 822 S.E.2d 780, 785 (2018) (citations, quotation marks, and brackets omitted).

"We review the trial court's bad faith determination for abuse of discretion[ ]" and will "upset" such determination "upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *Cash v. Cash*, 286 N.C. App. 196, 208, 880 S.E.2d 718, 728 (2022) (citation and quotation marks omitted).

Here, the trial court found "[n]o credible evidence was presented that [ ]Wife has depressed her income in bad faith and there is, therefore, no basis to impute income to [ ]Wife." This finding alone is sufficient to overcome Husband's argument, since only the trial court can assess the credibility of the evidence. *See Phelps v. Phelps*, 337 N.C. 344, 357, 446 S.E.2d 17, 25 (1994) ("[I]t is within the trial court's discretion to determine the weight and credibility that should be given to all evidence that is presented during the trial."). Although Husband argued Wife should be

required to work and presented evidence about her ability to do so at trial, the trial court found no credible evidence to support Husband's position. But in addition to the trial court's finding of "no credible evidence" that Wife had depressed her income in bad faith, the trial court also made extensive findings regarding Wife's employment history and circumstances at the time of trial. For example, the trial court also found Wife "left the workforce [in 2009] to become a full-time stay-at-home wife and mother[,]" "does not have the ability to become re-employed and to support herself financially[,]" and "is now close to retirement age and does not have the skills or work history to allow her to find employment as an attorney at this point in time and at this stage of her life." The trial court also found that Wife had in August 2021 "suffered catastrophic injuries" from a fall, including "multiple broken bones and a torn knee" and she "is still recovering from these injuries."

We conclude the trial court did not abuse its discretion in finding that Wife had not suppressed her income in bad faith and therefore not imputing income to Wife. The trial court properly considered Wife's near retirement age, her long-term status as a stay-at-home wife and mother, her inability to seek employment as an attorney due to her inactive status from the bar, and her recent injury.

The trial court did not abuse its discretion in determining the alimony amount. The trial court considered all the factors as required by North Carolina General Statute Section 50-16.3A, including all available income sources to Wife she was currently and *actually* receiving, the relative size of each parties' estate, the

reasonable needs of Wife, and her present inability to rejoin the workforce.

### 2. *Duration*

Husband makes three main arguments regarding the duration of alimony set by the trial court: (1) "[t]he trial court failed to include its reasoning for the alimony duration"; (2) the trial court failed to consider how the parties' needs and incomes would change over time; and (3) the "duration set by the trial court was intended to punish Husband for his marital misconduct."

Again, we review the trial court's determination of the duration of alimony for abuse of discretion. *See Kelly*, 228 N.C. App. at 601, 747 S.E.2d at 272. Here, the trial court set an indefinite alimony duration that would cease only upon the occurrence of any of the following events: (1) "[ ]Wife's death"; (2) "[ ]Husband's death"; (3) "[ ]Wife's cohabitation (as . . . defined by [North Carolina General Statute Section] 50-16.9(b))"; or (4) "[ ]Wife's remarriage."

#### a. *Rationale for the duration of alimony*

Regarding justification for the duration of alimony, Husband argues "[a] trial court is required to include its reasoning, based upon competent evidence, for the alimony duration, and failure to explain what competent evidence justifies the duration requires remand." Husband specifically contends, here, "[t]he trial court's only mention of the alimony duration appears in the decretal section, stating, '[ ]Husband shall pay permanent ongoing alimony to [ ]Wife in the sum of $14,727.52 per month.'" But again, Husband's argument about the absence of explanation for

the duration of the alimony award ignores most of the six single-spaced pages of findings of fact included in the entire section of the Alimony Order entitled "Factors related to Amount, *Duration*, and Manner of Payment ([North Carolina General Statute Section] 50-16.3A(b)." (Emphasis added.) All these findings regarding the "factors" were part of the trial court's explanation of its decision regarding the duration of the alimony award.

In making this argument, Husband cites to this Court's opinion in *Fitzgerald v. Fitzgerald*, 161 N.C. App. 414, 588 S.E.2d 517 (2003). In *Fitzgerald*, this Court reversed and remanded an alimony award where, though the trial court "made sufficient ultimate findings of fact to support its award of alimony[,]" it "did not make required findings as to the reasons for making the duration of the alimony continuous until [the] defendant dies, remarries, or cohabits[.]" *Id.* at 421, 588 S.E.2d at 522 (citations omitted). Under North Carolina General Statute Section 50-16.3A, "[t]he [trial] court shall set forth the reasons for its award or denial of alimony and, if making an award, the reasons for its amount, duration, and manner of payment." N.C. Gen. Stat. § 50-16.3A(c).

> This Court has held that a trial court's failure to make any findings regarding the reasons for the amount, duration, and the manner of payment of alimony violates [North Carolina General Statute Section 50-16.3A(c)]. In *Williamson,* as in this case, the trial court, without making any findings as to its reasoning for the duration of the alimony or manner in which it was to be paid, ordered alimony to be paid until the death of a party or the dependent spouse's remarriage or cohabitation and that it

be paid directly to the clerk of court.

*Fitzgerald*, 161 N.C. App. at 421, 588 S.E.2d at 522-23 (citing *Williamson v. Williamson*, 140 N.C. App. 362, 365, 536 S.E.2d 337, 339 (2000)).

Wife, however, argues the findings made by the trial court here mirror the detailed findings in *Yeun-Hee Juhnn v. Do-Bum Juhnn*, 242 N.C. App. 58, 775 S.E.2d 310 (2015). In *Juhnn*, this Court affirmed an order setting an alimony duration of eighteen years where the trial court made "seventy-six findings of fact" relating to the defendant's marital misconduct, substantial ability to support the family financially, and his decision to "provide[ ] for his paramour and her children while refusing to provide support to [the] plaintiff and his children[.]" *Id.* at 63, 775 S.E.2d at 314. The seventy-six findings in *Juhnn* also addressed the plaintiff's absence from the workforce for many years to support her family, her inability to rejoin the workforce, and her having "significantly less earning potential or earning capacity than [the d]efendant[.]" *Id.* at 65, 775 S.E.2d at 315 (internal quotation marks omitted).

Further, in *Rea*, this Court also affirmed the duration of an alimony order where

> the trial court did not simply recite that it had considered this list of factors [in North Carolina General Statute Section 50A-16.3]; it made findings of fact regarding the relevant factors. Other findings in the order . . . specifically address many of these factors in detail, including marital misconduct; the relative earnings and earning capacities of the parties; the duration of the marriage; the good health

> and ages of the parties; the standard of living established during the marriage; the relative assets and liabilities of the parties; and the relative needs of the parties. The trial court properly considered the required factors and set the duration of the alimony in its discretion. We discern no abuse of discretion in the trial court granting 10.5 years of alimony.

262 N.C. App. at 431, 822 S.E.2d at 433 (citation omitted).

Here, as in *Juhnn* and *Rea*, the trial court made extensive, detailed findings under North Carolina General Statute Section 50A-16.3 in support of its indefinite award including, but not limited to: marital misconduct by Husband; his remarriage and financial support of his new family; the earning capacities of the parties; their age and physical health; Wife's role in supporting her family while Husband completed his medical education and training; her later absence from the workforce to support her family at home; her present inability to practice law again; and the parties accustomed standard of living during their marriage. Given these findings, the trial court concluded that "[c]onsidering all of the facts and circumstances of this case, including the acts of marital misconduct . . . , an award of alimony is mandatory and equitable."

### b. *Failure to consider future changes*

Husband further contends the trial court abused its discretion in setting an indefinite alimony award because it failed to consider how the reasonable needs and incomes of both parties would change in the future. Specifically, Husband contends Wife's income will increase once she begins drawing Social Security benefits, and that

his income "will drastically be reduced within five . . . years[ ]" as he is currently 62 years old and will not be collecting income from his employment once he retires. However, Husband cites no case law, nor any language in Section 50-16.3A, suggesting the trial court is required to consider the *future* needs and incomes of the parties in determining proper alimony amount and duration. Indeed, we are quite certain that neither Husband nor the trial court has the ability to predict the future.

But since no one can predict the future, our alimony law does have a way to deal with later changes in circumstances. Under North Carolina General Statute Section 50-16.9(a), "[a]n order of a court of this State for alimony or postseparation support, whether contested or entered by consent, may be modified or vacated at any time, upon motion in the cause and a showing of changed circumstances by either party or anyone interested." N.C. Gen. Stat. § 50-16.9(a) (2023). The trial court did not abuse its discretion by not considering possible future changes in the parties' financial circumstances.

*c. Effect of illicit sexual behavior on the duration of alimony*

Finally, Husband argues the indefinite duration of the alimony award "was intended to punish Husband for his marital misconduct." Specifically, he contends "[t]he trial court's ruling was clearly intended to punish Husband . . . by forcing him to work for the rest of his life in order to allow Wife 'to continue to live as the wife of a wealthy doctor,' while refusing to support herself in any way." But again, Husband overlooks most of the trial court's extensive findings regarding the Section 50-16.3A

factors which were part of the trial court's discretionary decision to award alimony until death or remarriage.

In presenting this argument, Husband cites to this Court's opinion in *Taylor v. Taylor* where we held "[t]he purpose of the award is to provide for the reasonable support of the wife, not to punish the husband or to divide his estate." 26 N.C. App. 592, 595, 216 S.E.2d 737, 739 (1975) (citation and quotation marks omitted). It appears Husband cited this 1975 case mainly because it used the word "punish" in a portion of the opinion citing an even earlier case, *Schloss v. Schloss*: "The judgment is more in the nature of a division of [the] defendant's estate than it is an award of alimony, and this is wrong. 'The purpose of the award is to provide for the reasonable support of the wife, not to punish the husband or to divide his estate.' " *Id.* (quoting *Schloss v. Schloss*, 273 N.C. 266, 272, 160 S.E.2d 5, 11 (1968)). *Taylor* was decided in 1975, before North Carolina adopted equitable distribution, and the trial court had awarded a large lump sum to the wife in an apparent effort to distribute a portion of the value of the husband's business to her—something the trial court did not have the authority to do under the law at that time. *See id.* at 594-95, 216 S.E.2d at 739 ("It should also be noted that this is not a 'Community Property' state and only the Legislature could properly make it one. The lawmaking branch having declined to enact that or a similar concept, it should not come to be by judicial dictum, however well intentioned or fair-minded it may appear in a particular case."). Otherwise, neither *Taylor* nor *Schloss* tend to support Husband's argument:

The wife of a wealthy man, who has abandoned her without justification, should be awarded an amount somewhat commensurate with the normal standard of living of a wife of a man of like financial resources.

The fact that the wife has property of her own does not relieve the husband of the duty to support her following his unjustified abandonment of her. Nevertheless, the statute expressly provides that the earnings and means of the wife are matters to be considered by the judge in determining the amount of alimony to be awarded. It is a question of fairness and justice to both. The purpose of the award is to provide for the reasonable support of the wife, not to punish the husband or to divide his estate.

*Schloss*, 273 N.C. at 272, 160 S.E.2d at 11 (citations and quotation marks omitted).

We also note that both the equitable distribution and alimony statutes have changed substantially since *Schloss* and *Taylor* were decided. As Wife contends, "[North Carolina General Statute Section] 50-16.3A (enacted in 1995)[ ]" does "include[ ] some modicum of punishment[,]" citing to Reynolds on Family Law:

The only way the 1995 legislation reflects the goal to punish is in the non-discretionary treatment of illicit sexual behavior by the supporting spouse. When the non-discretionary treatment applies, the court must award alimony to the dependent spouse without considering any marital misconduct by the dependent spouse, reflecting the view that the supporting spouse should be punished for the uncondoned illicit sexual behavior that occurred on or before the date of separation.

2 Suzanne Reynolds, *Reynolds on North Carolina Family Law* § 5.18(b)(2) (2024).

Section 50-16.3A, which was adopted in 1995, specifically directs that marital misconduct "shall" be considered by the trial court in making its alimony

determinations, including amount and duration. *See* N.C. Gen. Stat. § 50-16.3A(b)(1).

And for one particular form of "marital misconduct" by a supporting spouse, "illicit

sexual behavior," alimony is mandatory:

> The court shall award alimony to the dependent spouse
> upon a finding that one spouse is a dependent spouse, that
> the other spouse is a supporting spouse, and that an award
> of alimony is equitable after considering all relevant
> factors, including those set out in subsection (b) of this
> section. . . . *If the court finds that the supporting spouse*
> *participated in an act of illicit sexual behavior, as defined*
> *in [North Carolina General Statute Section] 50-16.1A(3)a.,*
> *during the marriage and prior to or on the date of*
> *separation, then the court shall order that alimony be paid*
> *to a dependent spouse.*

N.C. Gen. Stat. § 50-16.3A(a) (emphasis added).

As this Court explained in *Romulus v. Romulus*, the marital fault of "illicit

sexual behavior" is treated differently than the other seven potential types of "marital

fault":

> "Illicit sexual behavior" is one of the eight forms of "marital
> misconduct" as defined by [North Carolina General Statute
> Section] 50-16.1A(3) . . . . "Illicit sexual behavior" is treated
> differently from all other forms of "marital misconduct," as
> the trial court has the discretion to weigh all of the other
> forms of "marital misconduct" and to determine what
> effect, if any, the misconduct should have upon the alimony
> award. *See* N.C. Gen.Stat. § 50-16.3A(b) ("The court shall
> exercise its discretion in determining the amount,
> duration, and manner of payment of alimony. In
> determining the amount, duration, and manner of payment
> of alimony, the court shall consider all relevant factors,
> including: (1) The marital misconduct of either of the
> spouses."). As to "illicit sexual behavior" only, [North
> Carolina General Statute Section] 50-16.3A(a) eliminates

> the trial court's discretion to weigh the marital misconduct
> of the parties unless both parties have committed "illicit
> sexual behavior."

215 N.C. App. at 521-22, 715 S.E.2d at 325 (ellipses and footnote omitted).

We recognize that the effect of "illicit sexual behavior" as a mandatory basis for either allowing or denying alimony may seem punitive to the unfaithful party, either the dependent spouse or the supporting spouse. *See id.* at 497, 715 S.E.2d at 310-11 ("As to the denial of alimony, we affirm the trial court's conclusion that [the] plaintiff is barred from alimony by her uncondoned 'illicit sexual behavior' during the marriage, despite the trial court's findings as to [the] defendant's physical abuse of [the] plaintiff and their children. Our legislature has decreed that even one fleeting incident of 'illicit sexual behavior' by a dependent spouse automatically bars her from an alimony award, even if the supporting spouse has committed serious, indeed criminal, physical abuse, against his wife and children throughout the marriage, and we have no authority to question the legislature's wisdom in adopting this rule.").

Here, the trial court made detailed findings about Husband's "especially egregious illicit sexual affair" with Darla, beginning about three years before the parties separated. As already discussed, the trial court did not abuse its discretion in setting the amount of alimony after considering both parties' reasonable expenses and incomes. Wife's income was far from enough to provide for her reasonable expenses as determined based on the accustomed standard of living during the marriage, and Husband has the ability to provide for her reasonable needs while still

leaving him with the means to cover not only his own expenses, but also those of his new wife, Darla, and her adult child. In fact, the trial court found that in addition to supporting Darla and her adult child, Husband had spent $490,000.00 to renovate her home, paid off her daughter's student loan of about $55,000.00, and paid Darla's attorney fees of about $45,000.00. The trial court did not abuse its discretion by considering Husband's marital misconduct as a significant factor supporting the duration of the alimony award. Husband's argument is overruled.

## IV.  Conclusion

We affirm the Alimony Order as the trial court did not err by concluding that Wife is a dependent spouse and the trial court did not abuse its discretion in determining the amount and duration of the alimony. The trial court's findings thoroughly addressed the factors required under North Carolina General Statute Section 50-16.3A. Further, the trial court's order did not punish Husband for his illicit sexual behavior during the marriage but gave proper consideration to this factor as required under North Carolina General Statute Section 50-16.3A.

AFFIRMED.

Judge ZACHARY concurs.

Chief Judge DILLON dissents by separate opinion.

DILLON, Chief Judge, dissenting.

I agree with most of the majority opinion. I agree the trial court made sufficient findings to justify Wife's entitlement to alimony. However, I agree with Husband that the trial court did not make adequate findings regarding certain evidence presenting about Wife's income available to fund for her own reasonable monthly expenses. Accordingly, my vote is to vacate the order and remand the matter for the trial court to make additional findings regarding Wife's income.

As noted by the majority, in determining the appropriate amount of alimony, the trial court "*shall* consider all relevant factors, including . . . [t]he amount of earned and unearned income of both spouses, including, but not limited to . . . dividends and benefits such as . . . retirement [and] social security[.]" N.C.G.S. § 50-16.3A(b)(7) (emphasis added).

The trial court found Wife to be 63 years of age. The trial court found – for purposes of calculating the appropriate award of alimony – the income Wife had available to pay for her own expenses was her non-retirement brokerage account earnings, totaling $1,991.28 per month. Indeed, there was evidence presented that Wife's assets include $1.445 million in that brokerage account.

There was also evidence, however, that Wife had another $1.214 million in an IRA account, earning $2,451.33 per month. I believe the trial court erred by failing to make findings showing it considered this evidence of Wife's income from her IRA, income which she chooses to allow to be reinvested in that IRA. *See Bryant v. Bryant*,

139 N.C. App. 615, 618 (2000) (interpreting first part of holding in *Glass v. Glass*, 131 N.C. App. 784, (1998), to require income invested in retirement accounts and dividends being automatically reinvested be included in income); *Friend-Novorska v. Novorska*, 131 N.C. App. 867, 870 (1998) (must include investment income that is automatically reinvested); *Parsons v. Parsons*, 231 N.C. App. 397 (2013) (interest and dividend income, generated by investment account and distributed to wife monthly as her sole source of income, properly used to determine wife's gross monthly income).

At 63 years of age, Wife is eligible to pull this income from her IRA without penalty to satisfy her reasonable monthly expenses. I note that, as pointed out by Wife in her brief, the trial court did make findings Wife should not have to deplete her estate to take care of herself. However, requiring Wife to pull this income to support her lifestyle would not *deplete* her assets, i.e., her IRA corpus. Rather, allowing Wife to reinvest her IRA dividend/interest income serves only to *increase* Wife's estate.

The trial court found that Wife's reasonable monthly expenses include $2,500.00 per month to increase her retirement savings and that this reasonable expense must be funded by Husband through alimony. The trial court, though, should have made findings concerning the evidence that Wife is already earning about that amount which is being used to fund further increase (beyond mere appreciation) in her retirement savings. There is a possibility that – by not considering Wife's IRA dividend/interest income in its calculus – the trial court has

double counted.  That is, based on the alimony award ordered by the trial court, Wife's retirement is actually being funded by about $5,000.00 per month - $2,451.33 funded from dividends/interest earned in her IRA and $2,500.00 funded by Husband through the alimony award – being about double the amount the trial court found necessary to meet Wife's reasonable needs.

In sum, the trial court had discretion to determine it to be reasonable for Wife to allow the dividend/interest income which her IRA already generates to be reinvested in her IRA to increase her retirement estate and to require Husband to contribute additional sums each month towards Wife's retirement.  But based on the trial court's finding that Wife's reasonable expenses included only $2,500.00 per month for retirement savings, it was perhaps error for the trial court to require Husband to pay an additional $2,500.00 per month in alimony to cover this reasonable expense, rather than just requiring Husband to pay $48.67 per month to cover this expense.

Further, at 63 years of age, Wife is eligible to collect social security.  The trial court did not make any express finding regarding this potential income source.  The trial court did find there was no credible evidence Wife has depressed her income in bad faith.  But it appears from the context of this finding within the broader order that this finding was made in relation to Wife's choice not to seek employment at 63 years of age.  There is no finding concerning the evidence offered regarding her eligibility to receive social security.  It may be that the trial court would find it

3

*DILLON, C.J., dissenting.*

appropriate to allow Wife to wait a few more years to collect social security so she would receive a greater monthly benefit. But since there was evidence concerning Wife's eligibility to receive social security benefits now, the trial court must make findings showing it considered the evidence of this current source of income.

I understand the IRA income and the social security benefits may not be *taxable* income until pulled out, if at all. But just because an income source is not subject to taxation does not mean the trial court should not consider evidence concerning such income sources, where evidence has been presented these sources are available to the dependent spouse.